735 So.2d 1071 (1999)
Billy Wayne KELLY, Appellant,
v.
STATE of Mississippi, Appellee.
No. 97-KA-01563-COA.
Court of Appeals of Mississippi.
March 23, 1999.
*1072 Anthony J. Buckley, David L. Sullivan, Laurel, Attorneys for Appellant.
Office of the Attorney General by Dewitt T. Allred III, Attorney for Appellee.
*1073 BEFORE THOMAS, P.J., LEE, AND SOUTHWICK, JJ.
THOMAS, P.J., for the Court:
¶ 1. Billy Wayne Kelly appeals to this Court his conviction of three counts of manslaughter in the Jones County Circuit Court. From that conviction, Kelly was sentenced to serve a term of twenty years on each count with each sentence to run consecutively with the Mississippi Department of Corrections. Feeling aggrieved, Kelly assigns the following issues, taken verbatim from appellant's brief, as error:
I. THE COURT ERRED IN RULING ADMISSIBLE FOR TRIAL THE DEFENDANT'S CONFESSION OF 09-09-96, SINCE THE DEFENDANT TESTIFIED AT THE HEARING THAT THE CHIEF INVESTIGATING OFFICER HAD MADE THREATS AND PROMISES AND THE DA NEVER PUT THE OFFICER ON TO REBUT THE ALLEGATIONS.
II. THE COURT ERRED IN ADMITTING INTO EVIDENCE THE DEFENDANT'S CONFESSION OF 09-09-96, AS THE CONFESSION WAS INVOLUNTARILY GIVEN, AND THE PRODUCT OF PROLONGED POLICE INTERROGATION IN VIOLATION OF THE FOURTH, FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTIONS 23 AND 26 OF THE MISSISSIPPI CONSTITUTIONS.
III. WHETHER THE PROSECUTION COMMITTED DISCOVERY VIOLATIONS WHICH GRAVELY PREJUDICED BILLY WAYNE KELLY; AND WHETHER THE COURT ERRED IN NOT GRANTING A CONTINUANCE AND FUNDS FOR THE DEFENSE TO RETAIN A REBUTTAL EXPERT WITNESS.
IV. WHETHER THE PROSECUTORS ELICITED IRRELEVANT, PREJUDICIAL TESTIMONY IN REGARDS TO THE DEFENDANT BEING IN JAIL, OVER OBJECTION.
V. WAS THERE REVERSIBLE ERROR, WHEN THE DISTRICT ATTORNEY, ON CROSS-EXAMINATION OF THE DEFENDANT, ASKED A SERIES OF INFLAMMATORY, IRRELEVANT AND PREJUDICIAL QUESTIONS, REGARDING PRIOR BAD ACTS AND MISCONDUCT, ALL OVER CONTINUING OBJECTION, MANY OF WHICH HAD PREVIOUSLY BEEN RULED INADMISSIBLE, AND MOST OF WHICH WERE ASKED WITHOUT A TIME FRAME, FOUNDATION AND NEVER PROVED?
VI. THE TRIAL COURT ERRONEOUSLY ALLOWED THE ADMISSION OF EVIDENCE OF PRIOR BAD ACTS OF THE DEFENDANT BY THE PROSECUTOR WHOSE PREJUDICIAL EFFECT OUTWEIGHED ANY PROBATIVE VALUE OF THE EVIDENCE.
VII. THE COURT ERRED IN INSERTING INTO THE MANSLAUGHTER INSTRUCTION 4, S-5, AND S-6, THE ISSUE OF SELF-DEFENSE, A DEFENSE NOT ARGUED BY THE DEFENDANT.
¶ 2. Finding error, we reverse and remand for a new trial. All assignments of error presented on appeal have merit and will be addressed accordingly.

FACTS
¶ 3. On November 7, 1996, Billy Wayne Kelly reported his family missing to the Laurel Police Department at around 5:45 p.m. The persons reported missing included Kelly's wife, Tina, and their two children, two-year-old Erica and four-month-old Christopher. Officer Brian Boutwell of the Laurel Police Department took the report.
*1074 ¶ 4. Kelly reported that he and his family, Tina and the two children, were returning home from an eye doctor appointment at around 2:30 p.m. The Kellys decided to first go to Tina's mother's home on 522 West 14th Street. While en route to Tina's mother's home, their family car stalled on 5th Avenue after driving through deep water on 5th Avenue at around 3:00 p.m. The rain storm that afternoon caused torrential flooding in many of the city's drainage creeks causing spillage onto many of the city's streets. Kelly attempted to restart the car but his efforts were to no avail. Kelly advised Officer Boutwell that Tina was afraid of bad weather and was upset that the car had stalled. Kelly further advised Officer Boutwell that Tina wanted to walk with the two children to her mother's house on West 14th Street, which was only a few blocks away from where the car had stalled.
¶ 5. Kelly advised that he continued to work on the stalled car and that he had not seen them since. At around 4:00 p.m., a passing motorist stopped and helped Kelly pull the car to Tina's mother's home on West 14th Street. According to Kelly, it was then that he discovered Tina and the children were not there. Kelly, with the aid of some friends, began looking for his family but were unsuccessful in locating them. Kelly stated that was when he called the Laurel Police Department.
¶ 6. While investigating the missing person's report, officers of the Laurel Police Department returned to 5th Avenue and the last known location of the missing persons as provided by Kelly. A search of the area uncovered a baby carrier identified as belonging to Christopher Kelly in the drainage creek near 5th Avenue. The drainage creek ran parallel with 5th Avenue on the west side. Due to the torrential rainfall that afternoon the drainage creek was filled to capacity. There was no sidewalk between 5th Avenue and the drainage creek. Only a green metal barrier separated the West side of 5th Avenue from the drainage creek. A further search of the drainage creek the following morning, Saturday, November 9, 1996, resulted in the discovery of the bodies of Tina and the two children at different distances, covering 3 miles, down the creek from where Kelly had advised that he had last seen his family. Their cause of death was later determined to be freshwater drowning.
¶ 7. Shortly after the bodies were discovered that morning and after Kelly had been notified, Kelly was taken to the Laurel Police Department at around 12:00 p.m. for an interview. At 12:16 p.m. Kelly was read and he signed a written waiver to his rights. After an approximately ten hour interview, in which Kelly initially denied any involvement in the deaths of his family, Kelly gave a videotaped confession at around 10:00 p.m. that night. A written statement, previously signed by Kelly at a little before 10:00 p.m., was essentially read back to Kelly by Sargent Tony Hosey during the videotaped confession wherein Kelly admitted pushing his wife and two children into the creek after an argument. Kelly admitted that after the car stalled and Tina had set out for her mother's house with the two children, he left the car and caught up with them near the intersection of 5th Avenue and 13th Street. Kelly stated that Tina had crossed over the guard rail to get out of the road and admitted that an argument ensued, wherein, Tina pushed him and he pushed her back sending her and the two children into the swollen drainage creek where they were immediately swept away by the strong current. After these statements and the videotaped confession provided by Kelly, he was arrested, but later released the following day, Sunday, November 10, 1996.
¶ 8. On November 13, 1996, Kelly was taken to the Office of the District Attorney, Jeannene T. Pacific, where Kelly was further interviewed and essentially gave the same confession he had previously given on November 9, 1996. The November 13, 1996 interview and confession basically followed the same format as the confession obtained on November 9, 1996, wherein an *1075 officer read Kelly's previously signed statement to him and then Kelly would basically either answer in the affirmative or in the negative. Kelly again initially denied any involvement in the deaths of the family prior to giving his second confession. Kelly was then rearrested and charged with three counts of manslaughter. The charges were later upgraded to three counts of depraved heart murder. Trial was held on Monday, November 3, 1997; Kelly was convicted of three counts of manslaughter. At trial Kelly disavowed his confession and claimed it was coerced out of him by threats and promises. He claimed to have had no contact with his wife and children after their car broke down and they left for Tina's mother's house on foot; in short, he claimed alibi.

ANALYSIS

I.

THE COURT ERRED IN RULING ADMISSIBLE FOR TRIAL THE DEFENDANT'S CONFESSION OF 09-09-96, SINCE THE DEFENDANT TESTIFIED AT THE HEARING THAT THE CHIEF INVESTIGATING OFFICER HAD MADE THREATS AND PROMISES AND THE DA NEVER PUT THE OFFICER ON TO REBUT THE ALLEGATIONS.

II.

THE COURT ERRED IN ADMITTING INTO EVIDENCE THE DEFENDANT'S CONFESSION OF 09-09-96, AS THE CONFESSION WAS INVOLUNTARILY GIVEN, AND THE PRODUCT OF PROLONGED POLICE INTERROGATION IN VIOLATION OF THE FOURTH, FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTIONS 23 AND 26 OF THE MISSISSIPPI CONSTITUTIONS.
¶ 9. Kelly assigns error by the trial court in the admission of the confession provided by him on November 9, 1996. Kelly argues that the admission of the November 9, 1996 confession at the suppression hearing was improperly admitted in violation of the procedures set forth in Agee v. State, 185 So.2d 671 (Miss.1966). Kelly specifically maintains an Agee violation occurred in the prosecution's failure to secure the presence of all officers present during questioning once he made assertions of police misconduct in obtaining his confession. Kelly additionally argues that the trial court compounded the Agee violation for failing to conduct a subsequent Agee hearing at trial.
¶ 10. Officers Tony Hosey, Randy Dearman, and Chief Buckahults conducted the interview of Kelly on November 9, 1996 regarding the drowning deaths of Kelly's wife and two children. Kelly's interview began at around 12:00 p.m., and Kelly was read and he signed a written waiver of his rights at around 12:16 p.m. After approximately nine to ten hours of interview with the officers, during which time Kelly initially denied any involvement in the drowning deaths of his wife and two children, Kelly signed a written confession detailing his actions as pertained to their deaths. Kelly further gave a videotaped confession at around 10:00 p.m. that night. During the videotaped confession Kelly essentially answered in either the affirmative or in the negative as the details of his written statement were read back to him by Sergeant Hosey. In that confession Kelly admitted pushing his wife and two children into the creek after an argument.
¶ 11. At the suppression hearing Kelly testified, in detail, to several instances of police misconduct on the part of Officer Dearman and Sergeant Hosey, which if true, would render his November 9, 1996 confession involuntary and inadmissible.
Q. What did Tony Hosey tell you in there, if anything, about the reason for you to give a statement, if he told you anything.

*1076 A. He just told me to give a statement, to make it easier on myself to make a statement to where my wife and two kids could enter into Heaven. He just told me it would be easier on me if I confessed.
Q. Did he tell you it would be easier on you if you confessed?
A. He said that he would try to talk to the DA and get me put in either Whitfield or either East Mississippi.
Q. Now did you at any time during from 12:16 to when you were put in jail that night, come into contact with Randy Dearman alone?
A. Yes, sir.
Q. Did Randy Dearman ever talk to you in regard to making a statement in this case as to why you should make a statement?
A. Yes, sir.
Q. What did Randy Dearman say to you in that regard?
A. Basically the same thing that Tony Hosey did.
Q. And what was that? What's basically the same thing?
A. He told me to go ahead and confess, to make it easier on myself if I confessed it, that he would talk to the DA about getting me put in Whitfield or either East Mississippi.
Q. Whom did you understand to be heading this investigation?
A. I really did not know at that time.
Q. Now anytime from 12:15 until you were taken to the jail, which would be sometimefor all I can tell would have been 20 past 10:00 that evening, were you fed?
A. No, sir, I was not fed until likeI believe it was like 1:30 or 2:00 o'clock when I got down to the jail and then they fed me there.
Q. Did they offer you any food during that tentwelve hours?
A. No, sir.
Q. Did they tell you at any time that you were free to leave?
A. No, sir, I had the belief that I was under arrest for questioning. That's what mythat's what was told me, that I had to go down there for questioning.
* * *
Q. How did they try and make you confess. Now when you say they, who?
A. Well
Q. Just give me a name, not just aif you can recall.
A. Mainly, Tony Hosey had threatened me. He had told me that if I didn't confess, he would go and get several other officers and come in there and get it out of me.
Q. What about Officer Dearman? I know you mentionedI think you said he said it would be better or lighter on you and something about East Mississippi. But did he ever threaten you rather that promise you?
A. He had justhe got mad at me and told me he ought to knock the "p-h-u-h" out of me. (Indicating)
Q. What about officerI'm sorry Chief Buckhaults during the time from 3:00 o'clock on? Did he ever make any kind of promises, or threats, or what you took as ado you recall any statements he made to you? Let's just put it that way?
A. He just told me that I should go ahead and confess to this to where my two babies and my wife could enter into Heaven, because they were sitting up there wondering why I didn't confess, why I didn't go ahead and say that I done this to where they can go ahead and enter into the gates of Heaven.

*1077 * * *
Q. And you told him, I understand, that you didn't think that the right to a lawyer meant at the police station, is that correct?
A. Sir?
Q. You didn't know that you didn't have a right to a lawyer at the police station; is that correct?
A. No, sir, I did not. I thought I had to wait until I made a court appearance to where they could appoint me one.
Q. And did you at any time ask for a lawyer prior to that?
A. Yes, sir.
Q. How many times do you recall and who do you recall asking it to?
A. I believe it was Randy Dearman. I had asked him a couple of times.
Q. And what did he say in reply to that?
A. He just said that I wasn't going to get one right now.
¶ 12. Of the three officers, Tony Hosey, Randy Dearman and Chief Buckahults, present during the questioning of Kelly on November 9, 1996 only Officer Hosey and Chief Buckahults were present and available for questioning at the suppression hearing. Kelly's specific allegations of police misconduct during the November 9, 1996 interview went unanswered by Officer Dearman at the suppression hearing.
¶ 13. The proper procedure for proving the voluntariness of a confession has been clearly established in Agee v. State, 185 So.2d 671 (Miss.1966).
The State has the burden of proving the voluntariness of a confession. This burden is met by the testimony of an officer, or other person having knowledge of the facts, that the confession was voluntarily made without any threats, coercion, or offer of reward. This makes out a prima facie case for the State on the question of voluntariness. When objection is made to the introduction of the confession, the accused is entitled to a preliminary hearing on the question of the admissibility of the confession. This hearing is conducted in the absence of the jury.... [W]hen, after the State has made out a prima facie case as to the voluntariness of the confession, the accused offers testimony that violence, threats of violence, or offers of reward induced the confession, then the State must offer all the officers who were present when the accused was questioned and when the confession was signed, or give an adequate reason for the absence of any such witness.
Agee, 185 So.2d at 673 (citations omitted). The Agee rule remains a sound principle of law in this State. Thorson v. State, 653 So.2d 876, 888 (Miss.1994).
¶ 14. The requirements of Agee are not automatically fulfilled upon the prosecution's prima facie showing that the elicited confession was freely given and voluntary. Once the State makes a prima facie showing that the elicited confession was freely given and voluntary, further inquiry becomes mandatory "when the accused offers testimony that violence, threats of violence, or offers of reward induced the confession." Agee, 185 So.2d at 673. In so offering testimony that violence, threats of violence, or offers of reward induced the confession, the accused creates a rebuttable presumption that the State is required to meet by offering all officers present during questioning.
¶ 15. However, the State is not required to "recall [witnesses] merely to reiterate their earlier testimony" provided in the prosecution's prima facie showing to rebut the accused's testimony that his confession was involuntarily obtained. Sills v. State, 634 So.2d 124, 126 (Miss.1994) (quoting Abram v. State, 606 So.2d 1015, 1030 (Miss.1992)). Nevertheless, witnesses not called during the State's prima facie showing are required in rebuttal of the accused's allegations that his confession was involuntarily obtained. Once the State made its prima facie showing and upon *1078 Kelly's testimony alleging threats of violence, or offers of reward used to induce his confession, "the State must offer all the officers who were present when the accused was questioned and when the confession was signed, or give an adequate reason for the absence of any such witness." Agee, 185 So.2d at 673. This was not done in the case at hand.
¶ 16. While it would have been better practice, it was unnecessary to recall Sargent Hosey and Chief Buckahults to "reiterate their earlier testimony." The State was, however, required to call Officer Dearman to testify or provide an adequate reason for his absence at the suppression hearing. The State submits that the reason provided at the suppression hearing for Officer Dearman's absence was adequate under Agee. The district attorney offered the following reason for Officer Dearman's absence at the suppression hearing:
MS. PACIFIC: ... Randy Dearman is now employed with the DA's office in Brownsville, Texas. And, obviously, for financial reasons and physical reasons, we could not have him here for purposes of this suppression hearing.
¶ 17. It is well settled that the "adequate reason for absence" exception requires more. See Lettelier v. State, 598 So.2d 757, 760 (Miss.1992) (finding officers who no longer lived or worked in the county or were "merely" unavailable does not meet the exception); Powell v. State, 483 So.2d 363, 369 (Miss.1986) (finding officer who was attending police school in Louisville, Kentucky was not legally "unavailable" within the meaning of Agee); Kelly v. State, 414 So.2d 446, 447-48 (Miss.1982) (finding officer who was on vacation in Texas not legally "unavailable"); Miles v. State, 360 So.2d 1244 (Miss.1978) (finding officer who was on vacation in Arkansas was not legally "unavailable"). But see Turner v. State, 573 So.2d 657, 664 (Miss. 1990) (finding officer who was absent and unavailable to testify due to his wife undergoing breast cancer surgery and his presence was required with her in Chicago held "adequate reason for absence"). Under the holdings set forth above, the reason provided for Officer Dearman's absence at the suppression hearing fails to meet the required "adequate reason for absence" exception in Agee.
¶ 18. We recognize, however, that the Agee procedure is not an inflexible rule of law. In Wells v. State, 698 So.2d 497 (Miss.1997), the Mississippi Supreme Court addressed a "technical deviation" from the Agee rule on the required preliminary hearing:
The purpose of the Agee rule is to protect defendants from the admission into evidence of confessions which were not voluntary. Agee, 185 So.2d at 673. Naturally, in order to avoid the needless expense and delay of mistrials where confessions are admitted only later to be found involuntary, the suppression hearing should be conducted prior to the admission of the confession into evidence. However, where the trial court admits a confession without a suppression hearing, but nonetheless finds the confession to be voluntary and admissible in a subsequent hearing, the mere fact that the admissibility of the confession was not addressed prior to its introduction into evidence cannot be said to have prejudiced the defendant.
Wells v. State, 698 So.2d at 509 (emphasis added).
¶ 19. A subsequent hearing out of the presence of the jury on the voluntariness of Kelly's confession was never held despite Officer Dearman's presence at trial. We recognize that, albeit a "technical deviation" of the fartherest reaches, Officer Dearman was recalled on rebuttal and provided testimony of the voluntariness of Kelly's confession.
¶ 20. Assuming for the sake of argument that Officer Dearman's testimony at trial in rebuttal finalized meeting the requirements of Agee, we are still left with a silent record regarding the trial court's *1079 findings of fact and conclusions. A record that is silent as to the trial court's required rulings under Agee on the voluntariness of Kelly's confessions once Officer Dearman's presence was secured is not subject to a de novo review by this Court. We review the admissibility of a confession by the trial court under our well established abuse of discretion standard.
¶ 21. In view of our holding herein above, we might consider a remand of this case to the trial court with instructions to complete the suppression hearing and certify a record of the same to this Court so that we could adequately rule on the admissibility of the confession. However, in view of the errors addressed in Kelly's other assignments, we are compelled to reverse this case.

III.

WHETHER THE PROSECUTION COMMITTED DISCOVERY VIOLATIONS WHICH GRAVELY PREJUDICED BILLY WAYNE KELLY; AND WHETHER THE COURT ERRED IN NOT GRANTING A CONTINUANCE AND FUNDS FOR THE DEFENSE TO RETAIN A REBUTTAL EXPERT WITNESS.
¶ 22. In the first part of this assignment, Kelly maintains that the prosecution committed reversible error in failing to make available the written report, statement, or summary of the proposed testimony of the prosecution's expert witness, Dr. Steven Hayne, until the Friday before the Monday trial. Kelly asserts that the prosecution had not disclosed Dr. Hayne's proposed testimony regarding pattern-injury marks found on the faces of Tina and Erica Kelly's bodies. Dr. Hayne's expert pattern-injury testimony created a match between the pattern-injury marks found on both Tina's and Erica's faces and the patterns found on the face of an Iron Man watch believed to have been worn by Kelly at the time of Tina and Erica's death.
¶ 23. The State contends that although the written report was not prepared and disclosed to Kelly until October 31, 1997 there was nothing within the report of which Kelly was not already aware. The State maintains that Kelly had the "functional equivalent" of Dr. Hayne's written report months prior to trial in the form of Captain Dearman's narrative, which as argued by the State made it unavoidably obvious that the State intended to offer pattern-injury expert testimony at trial.
¶ 24. A pre-trial hearing was held on Friday, October 31, 1997, in response to a motion in limine filed the previous day by defense counsel. The motion in limine sought to prevent the introduction of the proposed expert testimony of Dr. Hayne, specifically his conclusions regarding the pattern-injury marks found on the bodies of Tina and Erica Kelly. Kelly argued in support of his motion that the prosecution had yet to provide a written report from Dr. Hayne containing those conclusions.
¶ 25. Under the circumstances of the case sub judice, we are not persuaded that Kelly had the "functional equivalent" of Dr. Hayne's opinion testimony as argued by the State. However, we note that Kelly was aware or should have been aware that such testimony could be offered at trial as was readily apparent from the obtaining of Kelly's Iron Man watch, the exhuming of bodies, and the subsequent video of Kelly's watch being rolled across the face of Tina and Erica and the autopsy report furnished Kelly well in advance of trial.
¶ 26. Nevertheless, the prosecution's failure to provide Kelly with a written report of the precise opinions and conclusions proposed by Dr. Hayne until the issue was forced by Kelly remains ever present. We further note that in addition to Dr. Hayne's report not having been made available, no written report had even been compiled on the eve of trial:
MR. BUCKLY: And we need the State to admit on the record that there is no written report of the watch mark comparisons, *1080 how it was done and the conclusions drawn.
MS. PACIFIC: At this point in time there is no written report.
MR. BUCKLY: Thank you.
MR. PHILIPS: In our possession.
MS. PACIFIC: I would also like to point out 
MR. RATCLIFF: And this is Friday before Monday of the trial.
¶ 27. Our rules of discovery are clear with respect to discoverable material of expert witnesses whose opinion testimony will be given at trial. Pursuant to the Uniform Rules of Circuit and County Court Practice Rule 9.04 in effect at the time of trial in the case sub judice:
A. Subject to the exceptions of subsection "B", below, the prosecution must disclose to each defendant or to defendant's attorney, and permit the defendant or defendant's attorney to inspect, copy, test, and photograph upon written request and without the necessity of court the following which is in the possession, custody, or control of the State, the existence of which is known or by the exercise of due diligence may become known to the prosecution:
4. Any reports, statements, or opinions of experts, written, recorded or otherwise preserved, made in connection with the particular case and the substance of any oral statement made by any such expert;
I. If at any time prior to trial it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order issued pursuant thereto, the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, or enter such other order as it deems just under the circumstances.
URCCC 9.04.
¶ 28. Kelly further assigns as error the trial court's denial of a court funded expert witness to rebut the testimony of Dr. Hayne's opinion testimony on the pattern-injury marks. In view of the fact that this case is to be remanded to the trial court for a new trial, we would encourage the trial court to revisit this issue further, since absent Kelly's confession, which he has asserted to be involuntarily obtained and untrue, the pattern-injury marks testimony is the only physical evidence linking Kelly to the crime charged. Harrison v. State, 635 So.2d 894, 900-02 (Miss.1994). See also Johnson v. State, 476 So.2d 1195 (Miss.1985) (holding that under doctrine of fundamental fairness, issue of whether an accused was entitled to an expert must be weighed on a case-by-case basis).

IV.

WHETHER THE PROSECUTORS ELICITED IRRELEVANT, PREJUDICIAL TESTIMONY IN REGARDS TO THE DEFENDANT BEING IN JAIL, OVER OBJECTION.
¶ 29. Kelly assigns error in the trial court's ruling on certain irrelevant, prejudicial testimony regarding Kelly's bond and his pre-trial incarceration. Kelly argues that this testimony elicited by the prosecution was not only irrelevant but its only purpose was to prejudice Kelly before the jury. Kelly made timely objections as to relevancy at trial, both of which were overruled. To the State's credit, the State concedes in its brief that the elicited testimony was irrelevant but nevertheless maintains that the testimony fails to prejudice Kelly and cites to Wiley v. State, 582 So.2d 1008, 1014 (Miss.1991) in support of their argument.
¶ 30. We are not persuaded that the rational of Wiley is applicable to the facts and circumstances in the case sub judice. While on trial for armed robbery with a firearm, Wiley was inadvertently escorted through a hallway outside the courtroom in shackles while the jury was also present in the hallway. Wiley's shackles were removed upon instruction of the court clerk once the situation became apparent. Wiley *1081 was not taken into the courtroom until the shackles had been removed. In reaching its conclusion, our supreme court relied on its previous reasoning in Rush v. State, 301 So.2d 297 (Miss.1974) and Lockett v. State, 517 So.2d 1317 (Miss.1987), in holding that such a brief incident while unintentional and coincidental does not result in prejudice and is therefore not a ground for reversal.
¶ 31. In this case, the prejudice asserted by Kelly through the irrelevant and prejudicial testimony elicited by the prosecution cannot be said to have occurred as a result of an unintentional act or mere coincidence. The Honorable Dennis Bisnette, the municipal court judge who conducted Kelly's initial appearance, was called by the defense to support Kelly's claim that he was not advised he had the right to a lawyer, and the right to have him present during questioning. During cross-examination of Judge Bisnette, the district attorney elicited the following testimony:
Q. All right. But the main purpose at that point is to set a bond; isn't that right?
A. That's correct. Yes, that's one of the main purposes.
Q. And in this case
A. And in this case I did not allow him a bond.
MR. BUCKLEY: We object to that. That's irrelevant and prejudicial. And I specifically told him not to go into that, in the presence of the Court, and would ask for a mistrial, your Honor.

THE COURT: Overruled.
¶ 32. It is an entirely different matter to question the witness as to why Kelly was before Judge Bisnette for his initial appearance versus inquiring further as to whether Kelly was granted or denied bond, the latter being completely irrelevant and prejudicial. The second incident occurred during the district attorney's cross-examination of Kelly. In that incident, the district attorney questioned Kelly regarding his pre-trial incarceration and his study of law books:
Q. What you were going to tell every tell the jury here today, what you were going to testify to.
A. I'm going to tell the truth.
Q. Okay. And you have been going down to the law library at the jail and doing quite a bit of reading, haven't you?
MR. BUCKLEY: Objection. Mistrial.
MR. RATCLIFF: We move for a mistrial, your Honor.
MR. BUCKLEY: She said while he was in jail in front of the jury.
MS. PACIFIC: Testimony has already been given today that bond was denied him, your Honor.
MR. BUCKLEY: Over our objection, sustained.
MR. RATCLIFF: The objection was sustained and it has been mentioned again.

THE COURT: Let's move on. Overruled.
¶ 33. Again, Kelly's pre-trial incarceration status, and for that matter, his use of the law library has no relevance and could serve no purpose but to create prejudice in the minds of the jury. We take note, as submitted in the State's brief, that it may very well be common knowledge that an accused may have been denied bond and had been incarcerated while awaiting trial. However common that knowledge may be, it does not create an open excuse to belabor the issue through the eliciting of irrelevant and prejudicial testimony which is clearly prohibited under Rule 403 of the Mississippi Rules of Evidence.
¶ 34. The objections raised at trial on this issue should have been sustained on the grounds of relevancy and prejudice. This is not to say that this issue standing alone would create reversible error; however, when combined with the cumulative effect of the other errors discussed within this appeal, we cannot conclude the eliciting *1082 of testimony regarding Kelly's bond denial and pre-trial incarceration was harmless.

V.

WAS THERE REVERSIBLE ERROR, WHEN THE DISTRICT ATTORNEY, ON CROSS-EXAMINATION OF THE DEFENDANT, ASKED A SERIES OF INFLAMMATORY, IRRELEVANT AND PREJUDICIAL QUESTIONS, REGARDING PRIOR BAD ACTS AND MISCONDUCT, ALL OVER CONTINUING OBJECTION, MANY OF WHICH HAD PREVIOUSLY BEEN RULED INADMISSIBLE, AND MOST OF WHICH WERE ASKED WITHOUT A TIME FRAME, FOUNDATION AND NEVER PROVED?

VI.

THE TRIAL COURT ERRONEOUSLY ALLOWED THE ADMISSION OF EVIDENCE OF PRIOR BAD ACTS OF THE DEFENDANT BY THE PROSECUTOR WHOSE PREJUDICIAL EFFECT OUTWEIGHED ANY PROBATIVE VALUE OF THE EVIDENCE.
¶ 35. Kelly argues that the district attorney engaged in a series of repeated inquiries into "prior bad acts" testimony that the trial court had previously ruled as inadmissible in its pre-trial rulings. Kelly furthers argues that the district attorney's continuous and unrestrained questioning specifically aimed at Kelly's alleged "prior bad acts," all of which were over the strenuous objections of defense counsel, created an unconscionably prejudicial image of Kelly's character through questions of inflammatory innuendo and unspecific references without an adequate time frame.
¶ 36. We will begin this assignment of error first by noting that a specific hearing was held prior to trial on this very issue and return to the pertinent parts of that hearing:

THE COURT: I'm going to make a ruling at this time.
MR. SULLIVAN: Your Honor, if I could

THE COURT: Only those things that could present itself as motive that would be admissible. All of these prior acts of all these other things, I don't want to get into that. But if you can show me something in that statement that you just made that would lend itself to a particular motive
MR. SULLIVAN: Your Honor, if I could just say one thing.

THE COURT: Well I'm trying to get it straight with him now
MR. SULLIVAN: Okay.

THE COURT: what I want him to consider. I am not going to open this thing up to where we can just try him on everything that he has ever done in regard to screaming and hollering and slapping and banging with his children and his wife. I mean, you know, that'shave there been any charges made, any specific charges with the Police Department in regard to any of these matters?
¶ 37. The court then heard argument on specific acts the prosecution sought to have introduced at trial regarding Kelly's alleged prior acts of verbal and physical abuse directed towards his family. After making a ruling on several of the acts, which the court stated were not to be inquired into at trial, the trial court continued its ruling specifically on the issue of introducing Kelly's alleged prior acts.

THE COURT: ... And I weighed those very heavily when I did say that they were admissible. And just to keep on allowing other things in that are not necessarily factual to this case but could weigh heavy on the jury's mind and makeand certainly these statements, any statement, about his conduct of *1083 threats, his action toward his children could prejudice the minds of the jury.
And I think that the jurors are entitled to hear what the State has got factually, based on the evidence it has been able to retrieve and the evidence it intends to present, without trying to confuse the jury with all of this cumulative stuff that has happened in the past.
So for that reason the Court is going to make a ruling and a finding in this case that the statements that have been presented to the Court would be prejudicial and that the probative value of these statements has to go down because of prejudice it might present to the jury.
¶ 38. However, at trial during Kelly's cross-examination, the district attorney, in a clear and flagrant disregard of the trial court's previous ruling, repeatedly launched into the issue of Kelly's alleged prior acts of verbal and physical abuse towards his family despite strenuous objections from defense counsel. We begin with the first question put to Kelly while on cross-examination by the district attorney:
Q. You loved her and the children?
A. Yes, ma'am.
Q. I didn't hear you.
A. Yes, ma'am.
Q. Then why was one of the first places you went to find them on Thursday was the domestic abuse shelter?
MR. BUCKLEY: Objection, your honor. May we approach the bench, your honor?

THE COURT: (NODS HEAD AFFIRMATIVELY)
(SIDE-BAR CONFERENCE)
MR. BUCKLEY: That has not been put into evidence.
MR. SULLIVAN: Your Honor has already ruled on that.
MR. BUCKLEY: I'm sorry. Could we have the court reporter? My objection to this, first of all, is that it has not been developed through any previous testimony.
Secondly, that's getting into character. That would also be very prejudicial to go into that. We've not opened the door to character, not one time.
MR. SULLIVAN: Not once.
THE COURT: All I can tell the DA is, if I get reversed on this case, she is going to answer for it. Let's proceed.
MR. BUCKLEY: I'd just like to have you rule

THE COURT: Sustained.
* * *
MS. PACIFIC: Am I not to go into it any further?

THE COURT: That's right.
¶ 39. The district attorney then continued Kelly's cross-examination. A short time later the trial judge held a further side bar conference on the issue of character. Discussion was held on the proper method for eliciting testimony on whether Kelly had in fact gone to the domestic abuse shelter trying to locate his wife, wherein the discussion was concluded with the following:

THE COURT: Just keep it clean, keep it straightforward and lay your predicate so there won't be no problems.
MS. PACIFIC: May I ask him if he has ever been [sic] any threats toward his wife?

THE COURT: Yeah.
MS. PACIFIC: Okay. Thank you.
MR. SULLIVAN: Your Honor, we object on the basisshe may can ask him if he went and if he says, no, then that doesn't go to why he wentand only if he says, no, can she impeach him on that.

THE COURT: She knows how to handle that, I hope.

*1084 * * *
Q. Okay. Now, Mr. Kelly, have you ever threatened you wife?
MR. SULLIVAN: Your Honor, we're going to object to that.
MR. RATCLIFF: Your Honor, it's the same thing this Court has already ruled on. We object. It's not material. It's irrelevant. It's prejudicial. This Court has already ruled that it should not be an issue before the Court.
And it's not proper redirect.

THE COURT: Overruled.
MR. SULLIVAN: Your Honor, we are going to ask for a mistrial because the District Attorney keeps bringing it up.

THE COURT: Overruled. You may proceed.
MS. PACIFIC: I understand that the Court had made a ruling.
Q. Have you ever threatened your wife?
A. In what way?
Q. Well a threat would be something that you told her you were going to do, or something that you possibly might do to her that would be something in the way that would be threatening to her, threatening to her life.

THE COURT: That's fine. You've finally gotten to the point. You've got to name what threat it is.
MS. PACIFIC: That'sthat's my question.

THE COURT: I could threaten to spit on the floor, but you have got to ask him something specific.
MS. PACIFIC: Yes, sir.
A. Could you repeat the question?
Q. Have you ever threatened your wife, Tina?
A. As in which way?
Q. All right. Listen.
MR. RATCLIFF: Your Honor, we're going to object.
Q. Let me just have Ms. Larsen to read back what I've just said. Because I may not say it the same way twice.
MS. PACIFIC: Would you do that, Ms. Larsen?
(COURT REPORTER READ BACK QUESTION FROM RECORD)
A. I cannot recall.
Q. I direct you attention to the summer of 1996, Mr. Kelly, and I ask you if you made a statement to John Hines that, if you had a place to bury Tina and the kids, that you would get rid of them?
A. No, ma'am, I did not state that.
Q. All right. Have you ever made
MR. BUCKLEY: Your Honor, we're going to object to Ms. Pacific reading statements from other people, too.

THE COURT: Sustained.
MR. BUCKLEY: Thank you, your Honor.
Q. Have you ever made a statement, Mr. Kelly, that the children were not yours?
A. No, ma'am.
MR. BUCKLEY: Can we approach the bench, your Honor?
(SIDE-BAR CONFERENCE)
MR. BUCKLEY: I believeI believe defense counsel is in a posture here of having to continually object, so I want a continuous objection. Where are these questions coming from? Where is the issue about the children coming from? Can they answer that? We did not go into character on direct examination. She's suggesting that there are other allegations of offenses that

THE COURT: I said she could as long as she asks it proper. But don't use other peoples' names.
MS. PACIFIC: Okay.

THE COURT: If he made statements to other people, fine. And then if he denies it, then call those people, but don't call their names.

*1085 MR. SULLIVAN: Your Honor, can we get a ruling under 404, why these are admissible? I mean, under 404(b). These are bad acts. The Court has already ruled on them.

THE COURT: He's charged with murder, that's why. Let's proceed.
(CONCLUSION OF SIDE-BAR CONFERENCE)
Q. Mr. Kelly, have you ever physically abused Tina?
A. Not to my knowledge, not physically.
Q. Did you ever state that you beat the s-h-i-t out of her?
A. No ma'am.
Q. Have you ever verbally abused Tina?
A. Not to my recollection, not as I can remember.
Q. Have you ever called her a stupid bitch, a retarded bitch, a dumb-ass, a whore and a slut?
A. No, ma'am.
Q. Have you ever gotten into your truck, struck it in reverse and raced out, trying to run over Tina?
MR. RATCLIFF: Your Honor, let me make this objection. We've got a continuing objection and I won't say another word.
But she comes up here and says, have you ever?

THE COURT: I know it. You need to make it
MR. RATCLIFF: Ever is a long time.

THE COURT: some kind ofI made a ruling earlier that it has to be and the cases
MS. PACIFIC: All right.

THE COURT: are just so replete
MS. PACIFIC: Strike

THE COURT: to the fact that it has to be relative in time.
MS. PACIFIC: All right. Strike that, and let me rephrase

THE COURT: It can't be something that's remote that happened ten years ago. It has to be something relative in time.
Q. During the last

THE COURT: Even the cases that you have furnished me says that.
MS. PACIFIC: Yes, sir.
Q. During last summer, 1996, did you ever rev up your truck and try to run over Tina?
A. No, ma`am, because the summer of '96 my truck was tore up.
Q. All right. About a month after Christopher was born, which would have put it around August of 1996, did you ever go into the Amoco Service Station and strike Erica so hard that you left a hand imprint on her back?
A. Not as I can recall, no, ma'am.
Q. As the child was leaving the store?
A. Not as I can recall.
Q. In mid-year, 1996, when Erica had wet her panties, did you strike her over twenty times?
A. No ma'am.
MR. RATCLIFF: Your Honor, again, I'm going to have toI'm going to object because that's

THE COURT: Sustained.
MR. RATCLIFF: That's ridiculous.

THE COURT: Sustained. Let it go. Sustained.
¶ 40. The introduction of character evidence is governed by Rule 404 of the Mississippi Rules of Evidence. The elicited testimony concerning Kelly's alleged acts of verbal and physical abuse against his family by the district attorney during cross-examination was none other than character evidence of alleged prior bad acts.
¶ 41. We again note that the trial court initially ruled that the testimony at issue was not to be ventured into at trial, but that once the trial was underway, the district attorney relentlessly revisited the testimony *1086 at issue, under strenuous objection from defense counsel each time the testimony was sought. Further, we note that in addressing defense counsel's objections to the present issue, contradictory rulings by the trial court in addressing these acts were given allowing some testimony yet denying similar testimony.
¶ 42. For purposes of clarity, Rule 404 of the Mississippi Rules of Evidence is as follows:
(a) Character Evidence Generally. Evidence of a person's character or a trait of his character is not admissible for the purposes of proving that he acted in conformity therewith on a particular occasion, except:
(1) Character of Accused. Evidence of a pertinent trait of his character offered by the accused, or by the prosecution to rebut the same;
(b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
¶ 43. Under 404(a)(1) character evidence of the accused is admissible for rebuttal purposes when the accused has "opened the door" and made his character an issue while on direct examination. See Quinn v. State, 479 So.2d 706, 708 (Miss.1985) (holding an accused who purposefully portrays himself as "pure as the driven snow" proceeds at his own risk and upon such portrayal; the State is then entitled to cross-examine accused on issues of credibility). However, where the accused refrains from calling his character or credibility into question while on direct, the State must likewise refrain from deliberately asking questions likely to "set up" the accused and bring into issue his character on cross-examination.
¶ 44. It is apparent from a review of the record below that the only inference which could possibly have called Kelly's character into question, by placing himself in a favorable light while on direct examination, was in response to a question inquiring into the last time Kelly saw his wife and children. Kelly responded that he helped his wife and children out of the car and kissed her goodbye. Clearly, this type of testimony is not an "opening of the door" which would trigger the district attorney's use of any alleged prior acts of verbal or physical abuse against his family as was done in the case sub judice. The only "door opening" which occurred in this case was done so by the district attorney at her own hands during the very first questions put to Kelly while on cross-examination. Impeachment by "set up" is clearly improper. See Tobias v. State, 472 So.2d 398 (Miss.1985). "[T]he prosecution's impeachment privilege may not exceed the extended invitation." Stewart v. State, 596 So.2d 851, 853 (Miss.1992) (citing Blanks v. State, 547 So.2d 29, 37 (Miss. 1989)).
¶ 45. The elicited "prior bad acts" testimony during Kelly's cross-examination was highly inflammatory, prejudicial and the majority of the same was without any definite time reference. The Mississippi Supreme Court has held:
It is error in the course of a trial where one is charged with a criminal offense for the state to inject extraneous and prejudicial matters and lay them before the jury. A combination of such instances may become fatal error and ground for reversal even though the court sustains objections to such questions.... One of the ingredients of a fair and impartial trial is that an accused person should be tried upon the merits of the case. Expressing it another way, the question of guilt or innocence of the crime charged should be received by the jury unhampered by any suggestion or insinuation of any former crime or misconduct that would prejudice *1087 jurors.... Considerable latitude should be given prosecutors in order that their zeal and devotion to duty may be pursued as they seek justice in criminal trials. As we have said before, it is not required that an accused person be given a perfect trial but justice does require that he be given a fair trial. We commend vigorous prosecutions so long as they are conducted within the rules of evidence. Our adversary system of jurisprudence does not contemplate that attorneys for either side will be completely passive or indifferent during court trials. Yet, fundamental fairness requires that any defendant should not be subjected to testimony and tactics which are highly inflammatory and prejudicial as shown by the record before us. See Allison v. State, 274 So.2d 678 (Miss.1973); Kelly v. State, 278 So.2d 400 (Miss.1973); and Wood v. State, 257 So.2d 193 (Miss.1972).
McDonald v. State, 285 So.2d 177 (Miss. 1973).
¶ 46. Assuming arguendo that Kelly had cracked the door or even fully opened it drawing his character into issue, admission of his alleged "prior bad acts" must nevertheless pass muster under the balancing required in M.R.E. 404(b) and 403. In addition to Kelly's previous assignment of error on the district attorney's eliciting of "prior bad acts" testimony during Kelly's cross-examination, Kelly argues that the trial court erred in failing to conduct a balancing of the testimony at issue under M.R.E. 404 and 403. To pass muster under Rule 404(b), the testimony sought must "be such that it satisfies some other evidentiary purpose beyond simply showing that [the defendant] is the sort of fellow likely to commit the crime charged...." Jenkins v. State, 507 So.2d 89, 91 (Miss.1987). The inquiry does not end with Rule 404(b), further balancing of the requirements in Rule 403 are required. The determination of "prior bad acts" testimony is a dual test encompassing both Rule 404(b) and 403. Jenkins further elaborates that:
To be sure, evidence admissible under Rule 404(b) is also subject to the prejudice test of Rule 403; that is, even though the Circuit Court considered the evidence at issue admissible under Rule 404(b), it was still required by Rule 403 to consider whether its probative value on the issues of motive, opportunity and intent was substantially outweighed by the danger of unfair prejudice. In this sense Rule 403 is an ultimate filter through which all otherwise admissible evidence must pass.

Id. at 93 (emphasis added).
¶ 47. Despite the trial court's previous pre-trial ruling under the 404(b) and 403 balancing test denying the State the right to delve into prior bad acts, the district attorney flew in the face of said ruling and proceeded to attack Kelly. Despite the initial trial court's rulings sustaining defense counsel's objections to the testimony elicited here on cross-examination, when it became clearly apparent to defense counsel that the prosecution's misconduct was going to continue unchecked by the trial court; defense counsel specifically requested a second ruling under 404(b).
MR. SULLIVAN: Your Honor, can we get a ruling under 404, why these are admissible? I mean, under 404(b). These are bad acts. The Court has already ruled on them.

THE COURT: He's charged with murder, that's why. Let's proceed.
¶ 48. The trial court's comment that the prior bad act testimony was admissible because this is a murder case has no support in case authority. We hold that Kelly was deprived of his fundamental right to a fair and impartial trial due to the eliciting of inflammatory, prejudicial, and remote in time "prior bad acts" testimony. The error was not harmless.

*1088 VII.

THE COURT ERRED IN INSERTING INTO THE MANSLAUGHTER INSTRUCTION S-4, S-5, AND S-6, THE ISSUE OF SELF-DEFENSE, A DEFENSE NOT ARGUED BY THE DEFENDANT.
¶ 49. Kelly assigns as error the inserting of self-defense language in the jury instructions. Kelly argues that State instructions S-4, S-5 and S-6 included language inferring Kelly was present at the time of the deaths of his wife and children. Separate instructions were given for Tina and each of the two children, respectively. Kelly argues that by including the self-defense language, "that the said killing was not done in necessary self-defense," in each of the State's lesser-included manslaughter instructions, the jury's attention was deflected away from his defense of alibi. In his argument to this Court, Kelly relies on Taylor v. State, 597 So.2d 192 (Miss.1992) in support of this assignment.
¶ 50. In Taylor, reversible error was found where the adding of similar self-defense language in no way related to the accused's defense as argued at trial. At trial Taylor argued accident or excusable homicide in defense of the shooting death of Linda Johnson. Taylor never asserted that the shooting was done in self-defense or by justifiable homicide. Kelly's circumstances are strikingly similar to those at issue in Taylor. Kelly never argued self-defense at trial; he asserted an alibi.
¶ 51. We review assignments of error on jury instructions by a reading of the whole of the instructions. In determining whether error lies in the granting or refusal of various instructions, the instructions actually given must be read as a whole. When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found. Coleman v. State, 697 So.2d 777, 782 (Miss.1997); Collins v. State, 691 So.2d 918, 922 (Miss.1997) (citing Hickom-bottom v. State, 409 So.2d 1337, 1339 (Miss.1982)). Instructions need not recite every possible point of importance, provided the instructions, when read as a whole, adequately provides the jury with the necessary instructions on the law as was supported by the evidence presented at trial. We cannot say that this was done in the case at hand.
¶ 52. We must "presume that the jury takes seriously what it is told by the court." Taylor, 597 So.2d at 195 (Miss. 1992). See, e.g., Folk v. State, 576 So.2d 1243, 1250 (Miss.1991); Dennis v. State, 555 So.2d 679, 682-83 (Miss.1989); West v. State, 519 So.2d 418, 423 (Miss.1988); Shoemaker v. State, 502 So.2d 1193, 1195 (Miss.1987); Martin v. State, 415 So.2d 706, 708 (Miss.1982). This rational is best stated in Taylor:
Because of this, we have repeatedly cautioned trial judges against interjecting before the jury impermissible or otherwise extraneous matters. A trial for murder is the most serious matter any court may entertain. Where, as here, the evidence is somewhat circumstantial and inconclusive, and where the Court has substantially instructed the jury that it consider a matter extraneous to the process, the risk of a misdirected verdict becomes intolerably high. We presume that the case was heard before a jury of intelligent laymen. Still, instructions should not test whether the jury may run successfully a course in labyrinthian logic. In the end, we cannot help but accept that placing the (non)issue of self-defense before the jury, and giving it a place of prominence in excess of that given the defense of accident [alibi], resulted in the substantial risk that the jury misapprehended the law in the course of its deliberations.
Taylor, 597 So.2d at 195 (Miss.1992).
¶ 53. We find reversible error in the trial court's grant the State's instructions S-4, S-5, and S-6 containing self-defense language in light of the holding in Taylor v. State, 597 So.2d 192 (Miss.1992).

CONCLUSION
¶ 54. The error in Issues I and II in the admission of Kelly's statement, without *1089 more, possibly could be cured with a supplemented record. The error in Issue III regarding discovery, standing alone, could be held harmless, as is true of error in Issue IV regarding the admission of Kelly being jailed. The error in the admission of 404(b) evidence under Issues V and VI requires reversal as is separately true of the error in the granting of the State instructions under Issue VII. Without question, the cumulative effect of the errors occurring during this trial mandates reversal.
¶ 55. We are loathe to reverse a case, particularly a tragedy such as this. However, we would be remiss in our duty if we failed to follow the dictates of our supreme court. Sadly, the district attorney's misconduct was uncalled for and unnecessary. This case presents a classic example of how not to prosecute a case.
¶ 56. THE JUDGMENT OF THE CIRCUIT COURT OF JONES COUNTY IS REVERSED AND REMANDED FOR A NEW TRIAL. ALL COSTS OF THIS APPEAL ARE ASSESSED TO JONES COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, COLEMAN, DIAZ, LEE, AND PAYNE, JJ., CONCUR.
IRVING, J., NOT PARTICIPATING.