LEE, J.,
for the Court.
PROCEDURAL HISTORY
¶ 1. Billy Wayne Kelly was indicted in January 1997 on three counts of depraved heart murder involving the deaths of his wife, Tina, and their two children, two year old Erica and four month old Christopher. A Jones County Circuit Court jury convicU ed Kelly of manslaughter on all three counts, and Kelly was sentenced to serve twenty years in prison for each count, each sentence to run consecutively to all other counts. Kelly appealed to this Court, and in Kelly v. State, 735 So.2d 1071 (Miss.Ct.App.1999), we reversed and remanded for a new trial, finding that the State had violated discovery rules, that improper testimony was allowed without a mistrial, that evidence of prior bad acts was improperly allowed, and that the jury was given improper instructions concerning self-defense.
¶ 2. After remand for a new trial, Kelly was found guilty of manslaughter with regard to the death of his wife, but he was found not guilty with regard to the deaths of his two children. Kelly was sentenced to serve twenty years in prison, with credit given for time already served. He filed a motion for new trial arguing that the verdict was against the overwhelming weight of the evidence, that evidence was improperly presented over his objection, that certain instructions were erroneously given, that the indictment was void, and that his confession was improperly admitted into evidence. The motion was overruled, and he now appeals to this Court, raising the following issues: (1) did the court err in allowing the State to strike a black juror for cause over defense counsel’s Batson objection; (2) did the court err in allowing Kelly’s confession to be admitted into evidence; (3) did the court err in allowing certain expert testimony; and (4) was the *317 verdict against the overwhelming weight of the evidence, and Kelly’s right to protection against double jeopardy violated? We find no merit to these issues and affirm.
FACTS
¶ 3. We thoroughly described the facts in this case in our previous opinion on this matter. See Kelly, 735 So.2d at (¶¶ 3-8). To briefly recap, on or about November 7, 1996, the Kelly family car flooded during a rainstorm in Laurel. After attempts to start the car, Tina and the kids started walking towards her mother’s home. Kelly ran after the others and a fight ensued, resulting in Kelly pushing his wife along with his two small children into a flooded drainage ditch. The three ultimately drowned after a current washed them away. Kelly was later questioned and confessed to pushing the three into the ditch. He recalled his confession a few days later for the district attorney, but later recanted at the trial, claiming he had no part in the deaths of his family and that his confession was the result of threats and promises.
DISCUSSION OF THE ISSUES
I. DID THE COURT ERR IN ALLOWING THE STATE TO STRIKE A BLACK JUROR FOR CAUSE OVER DEFENSE COUNSEL’S BATSON OBJECTION?
¶ 4. With this first issue, Kelly argues that the court violated the rule from Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), in allowing the State to strike a black juror for cause. Our standard of review concerning Batson decisions is this:
Batson clearly places upon the trial court the duty to determine whether purposeful discrimination has been shown ... Batson states that “ordinarily,” a reviewing court should give the trial court “great deference” .... [which] has been defined in the Batson context as insulating from appellate reversal any trial findings which are not clearly erroneous.
White v. State, 761 So.2d 221 (¶ 13) (Miss.Ct.App.2000). Kelly specifically cites to the following exchange between the trial judge, the prosecutor, Mr. Hedgepeth, and defense attorneys Buckley and Parrish:
MR. HEDGEPETH: Constance McCann, she was related to one of the witnesses. Which one of the witnesses? On our notes we just put related to witness and didn’t put the name of the witness.
MR. RATCLIFF: My notes reflect that she knows Frank Woods. She’s not related to him.
MR. HEDGEPETH: I didn’t think anybody knew aso [sic] to jurors?
MR. RATCLIFF: I wrote it down as to Constance McCann.
THE COURT: Just make your statement as to what it was so I can rule on it.
MR. HEDGEPETH: We had in our notes that she had responded that she was related to one of the witnesses by marriage. And because of that, we didn’t want her in there.
MR. PARRISH: Your Honor, that’s really pushing it. I don’t know what she said and I don’t know what witness it was, or even if it is actually going to be somebody that will be testifying. Everybody is reading off of a big list here. Unless we — it may be something entirely irrelevant. I noticed that they haven’t exercised challenges on other people, for every white person that said they knew a witness.
MR. HEDGEPETH: Well, also on her questionnaire, it shows that she has only *318 been employed for — I think that’s two weeks. It could be two or seven weeks with Howard Industries as a coil winder. It shows a less stable type of juror than we would want. She’s young with a number of children with no spouse. That doesn’t fit the type of profile of the type juror we would like to have on this panel.
MR. PARRISH: We introduced a copy of that juror questionnaire, and I think it will show other jurors, including white jurors, are in the same category; like Michelle Manning who is a young white woman—
MR. BUCKLEY: With a baby in court today.
MR. PARRISH: — that brought a child into court with her today. They accepted her. And they are wanting to excuse this black woman in addition because they say she has young children. I think we are grasping at things.
MR. HEDGEPETH: Although, Michelle Manning has been employed for three and a half years with the same employer. She’s a professional speech pathologist. Just a totally different type of juror all together.
THE COURT: All right. The Court accepts your reason as being race-neutral.
¶ 5. Kelly argues that this exchange shows that the trial judge erred in accepting the prosecutor’s reason for excluding juror McCann as race-neutral. In the transcript of voir dire proceedings, we find that Kelly requested a Batson hearing after the State’s first three strikes were all against black female jurors. The State addressed the three strikes individually, noting that the first was struck because she was young, unmarried, non-responsive, and failed to adequately fill out her juror questionnaire. The court accepted this as a race-neutral reason. The second juror was struck because she had gone to school with Dennis Bisnette, one of the district attorneys on the case, and she appeared to be “less than honest in her answers,” claiming that although she attended school with Mr. Bisnette for seven years, she did not remember him. The court accepted this as a race-neutral reason. The third juror struck was Constance McCann, whom the State first noted was related by marriage to one of the potential witnesses. Kelly’s attorney stated that his notes reflected that she knew potential witness Frank Woods, but she was not related to him. The prosecutor also noted that McCann was the single mother of several children and that her work history was not steady, distinguishing her from a single white mother that the State had declined to strike because she had been steadily employed in a professional career.
In Davis v. State, 660 So.2d 1228, 1242 (Miss.1995), this Court reiterated a list of reasons accepted as race neutral. “Included among those reasons: age, demeanor, marital status, single with children, prosecutor distrusted juror, educational background, employment history, criminal record, young and single, friend charged with crime, unemployed with no roots in community, posture and demeanor indicated juror was hostile to being in court, juror was late, short term employment.” We have also condoned a peremptory challenge against a juror who was acquainted with the defendant’s family.
Davis v. State, 767 So.2d 986 (¶ 22) (Miss.2000). In the present case, the prosecutor pointed out juror McCann’s status as the single mother of several children, that her work history was not steady, and that she was possibly related to or acquainted with one of the witnesses. According to Davis, these are acceptable race-neutral reasons for exclusion of a juror. We find no error *319 with the judge’s decision to allow the juror to be struck due to the reasons given.
II. DID THE COURT ERR IN ALLOWING KELLY’S CONFESSION
TO BE ADMITTED INTO EVIDENCE?
¶ 6. With his second issue, Nelly argues his confession was improperly admitted as evidence. “The admissibility of evidence rests within the discretion of the trial court. Appellate courts will not reverse a trial court on an admission decision unless the trial court abused its discretion. Evidence which is not relevant is not admissible.” Walker v. State, 759 So.2d 422(¶ 22) (Miss.Ct.App.1999) (citations omitted).
¶ 7. Upon Kelly’s arrest on November 9, 1996, he was taken into custody and was questioned for ten hours by three different officers. After more than nine hours of interrogation, Kelly signed a statement in which he admitted that he argued with his wife by the side of the creek, and that after she first pushed him, he in turn pushed her, causing her to fall into the creek with the kids. Kelly explains that this signed statement was used in a question and answer session on videotape whereby the officer asked questions relative to Kelly’s statement, and Kelly affirmed the story that he had just given in his statement. However, Kelly states on the videotape that although he did not understand his Miranda rights when he signed his statement of confession, he did now, and since the statement closely tied into the subsequent videotaped statement, the latter was the fruit of the poisonous tree and should not have been admitted. In his brief, Kelly also points out that on the videotape at the point that Officer Hosey asks Kelly if he waives his rights, “you can actually see in the picture Officer Hosey’s arm and hand motioning up and down for Billy Wayne Kelly to respond yes to his question!”
¶ 8. First, concerning whether or not Kelly’s initial signed statement was “poison fruit” as would cause the subsequent videotaped confession to be “poisonous fruit” as well, we note that this written statement was not admitted into evidence. Thus, the propriety of the statement is not something which we will contend ourselves. We do look to the video to determine whether or not the judge erred in allowing this to be admitted into evidence.
¶ 9. In the transcript of the video, we find that Officer Hosey used the statement as a guideline with which to direct his questions to Kelly. However, at the beginning of the tape, Hosey clearly explains Kelly’s rights to him, and Kelly affirms that he understands at that time, thereafter making his statement of confession:
HOSEY: Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say could be used against you in Court. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. If you can’t afford one, one will be appointed for you by the court, if you wish. If you decide to answer questions now without a lawyer, you still have the right to stop answering anytime. You also have the right to stop answering at anytime until you talk to a lawyer. You do have the right to have one with you when you’re being questioned. Do you understand what I read to you?
KELLY: I understand it now, but I didn’t earlier.
HOSEY: I know you advised me earlier that you did (Billy: I didn’t) but didn’t know, but now, now you do understand it? You do? Ok.
*320 KELLY: I figured that I’d have to have an attorney present with one in court. I didn’t know that I could have one present here, in here.
HOSEY: Well, do you understand that now?
KELLY: (nods head affirmative) HOSEY: Ok. I’m going to read this waiver to you now, ok? This is another part of the rights form, I have read this statement or have been read this statement as I’m reading it to you, now, of my rights and I understand what my rights are. I hereby waive all these rights. I am willing to make a statement and answer questions, like you have answered questions for us previous to this meeting here. I do not want a lawyer at this time. I understand and know what I am doing. This statement is wholly voluntary. No violence, threats of violence, coercion, inducements of any kind or promises of reward have been directed toward me by anyone in an effort to secure this statement. Furthermore, it is not the result of any sympathetic feelings I have toward any person. I want to back over one part of this, that says no violence. I hadn’t threatened you with violence or has anybody threatened you with violence? Capt. Pickering, Chief Buckhalts or Capt. Dearman? ' KELLY: (shakes his head no)
HOSEY: Coercion. Do you know what coercion is?
KELLY: (shakes his-head no) No sir. HOSEY: Nobody has uh beat you or anything like that?
KELLY: No.
-HOSEY: Inducements of any kind. Nobody has offered you money to talk to us or given or promised you any type of reward for doing this, so that’s what, what we’re talking about, nobody has done that for you, is that correct?
KELLY: (shakes his head affirmative) HOSEY: Ok. Now, you can understand this waiver?
KELLY: Yeah, (shakes his head affirmative).
¶ 10. From this excerpt of the transcript from the videotape, we have clear evidence that before Kelly responded to any questions from Hosey, even if the questions were based on Kelly’s afore signed statement, at the time he was videotaped, Kelly was well aware of his rights and he decided to go ahead with his confession. This being the case, we find the trial judge did not abuse his discretion in admitting the taped confession into evidence.
III. DID THE COURT ERR IN ALLOWING CERTAIN EXPERT TESTIMONY?
¶ 11. With his third issue, Kelly argues that the court erred in allowing Dr. Hayne to testify concerning an alleged mark on Tina Kelly’s face which Dr. Hayne testified was an imprint of her husband’s watch. Kelly claims that Dr. Hayne’s opinion was “rank speculation,” since he only visually examined the evidence and did not explain how many “points of comparison” he had used in positively identifying the wound as having been inflicted by Kelly’s watch.
¶ 12. “The admission of' expert testimony is addressed to the sound discretion of the trial judge. Unless we conclude that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion, that decision will stand.” Puckett v. State, 737 So.2d 322(¶ 57) (Miss.1999) (citations omitted). In reviewing the testimony of Dr. Hayne, we find that he clearly described the basis for his conclusion that, to a reasonable degree of medical certainty, the watch caused the wounds to Tina Kelly’s face. When asked to explain how he arrived at the conclusion that *321 the watch or a similar watch caused the injuries, the doctor explained:
DR. HAYNE: On the nose of Tina Kelly, there is a clear rectangular pattern forming an incomplete u-shape corresponds to the u-shape, and corresponds to the pattern. You can see squiggly lines on it. In addition, there was a small abrasion adjacent to it that is in line with the first block adjacent to the second block. The distances are the same; the width is the same and the length is the same. So we have multiple points of comparison; cross-sectional, one to the other, right angeles [sic], distances, presents of a incomplete second abrasion adjacent to the first one. So they are multiple points of comparison that showed and that has characteristics of the injury corresponding to an injury produced by this object or an object like this object.
¶ 13. Concerning injuries to Erica Kelly, one of the children, Dr. Hayne also found marks on her face were consistent with the watch:
DR. HAYNE: After looking at the forehead of Erica Kelly, I recognized in my opinion having multiple points of identity produced by two knobs on the side of watch, located towards the mid side of the forehead, and the presence of two rectangular blocks, semi circular curvatures that are identifiable, and also the notch on the opposite side of the watch. So there were multiple points of comparison, the relationships of the two rectangular blocks, and to the relationship to the individual points, curvatures, the distance across, and the like. So they are many, many points of comparison that I thought matched this watch or an object just like this watch that would produce those types of injuries.
¶ 14. Contrary to Kelly’s assertion, as described in the transcript excerpts, Dr. Hayne did have numerous points of comparison which he described with specificity. Thus, we cannot find that the judge abused his discretion in allowing Dr. Hayne’s testimony.
IV. WAS THE EVIDENCE SUFFICIENT TO SUPPORT THE VERDICT AND WAS KELLY’S RIGHT TO PROTECTION AGAINST DOUBLE JEOPARDY VIOLATED?
¶ 15. Finally, Kelly states that the verdict was against the overwhelming weight of the evidence; however, in actuality he makes a sufficiency argument. We cite our familiar standard of review.
[W]e must, with respect to each element of the offense, consider all of the evidence — not just the evidence which supports the case for prosecution — in the light most favorable to the verdict. The credible evidence which is consistent with the guilt must be accepted as true. The prosecution must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. Matters regarding the weight and credibility to be accorded the evidence are to be resolved by the jury. We may reverse only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty.
Neal v. State, 805 So.2d 520 (¶ 19) (Miss.2002).

a. Sufficiency of evidence

¶ 16. Kelly states that since the jury did not find him guilty for the deaths of his two children, they could only have found him guilty of the death of his wife if they believed the videotaped confession, yet did not believe Kelly’s other initial statements of denial, which he claims is unlikely. We recognize that judgment *322 on the credibility of the evidence is reserved to the jury.
We have repeatedly held that in a criminal prosecution the jury may accept the testimony of some witnesses and reject that of others, and that they may accept in part and reject in part the evidence on behalf of the state or on behalf of the accused. In other words, the credibility of witnesses is not for the reviewing court.
Mangum v. State, 762 So.2d 337 (¶ 35) (Miss.2000). The jury viewed the videotape themselves, heard very thorough testimony from the officers and experts and other witnesses, and viewed numerous exhibits, all of which combined to enable them to reach their informed decision. We find that in viewing the evidence in a light favorable to the verdict and accepting the evidence in support of the verdict as true, reasonable and fair-minded jurors could have found Kelly guilty. Thus, we find no merit to Kelly’s argument in this regard.

b. Double jeopardy

¶ 17. Under this issue, Kelly also offers what he calls a “double jeopardy” type argument that, according to jury instruction S-1A, he could only be found guilty of one death if he were found guilty of all three deaths, since the deaths were related. Thus, since the jury failed to convict on the deaths of the two children, their finding of guilty for Kelly’s wife was improper. Whether or not this actually is the case, we cannot find any place in the record where Kelly previously made this argument. Consequently, we find him to be barred now on appeal from raising this argument.
¶ 18. Without waiving the bar, we also find the substantive argument has no merit. Kelly fails to recognize the rule that all jury instructions are to be read and considered as a whole. Walker v. State, 671 So.2d 581, 596 (Miss.1995). We look to the remaining instructions and find that the court’s own instruction properly directed the jury that they were to determine for each of the three victims whether or not Kelly was guilty for each’s death. Reading this instruction in conjunction with instruction S-1A to which Kelly now objects, we find it clear that the jury was properly instructed as to its obligation. Thus, Kelly’s argument is without merit on this issue.
¶ 19. As described herein, Kelly has not raised grounds with this appeal as would give rise to our reversal. Accordingly, we affirm on all issues.
¶ 20. THE JUDGMENT OF THE SECOND JUDICIAL DISTRICT OF JONES COUNTY OF CONVICTION OF MANSLAUGHTER AND SENTENCE TO SERVE TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO JONES COUNTY.
McMILLIN, C.J., SOUTHWICK, P.J., BRIDGES, THOMAS, MYERS, CHANDLER AND BRANTLEY, JJ„ CONCUR. KING, P.J, CONCURS IN RESULT ONLY WITH SEPARATE WRITTEN OPINION. IRVING, J., NOT PARTICIPATING.