888 So.2d 437 (2004)
Joshua Kevin BRINK, Appellant
v.
STATE of Mississippi, Appellee.
No. 2002-KA-00583-COA.
Court of Appeals of Mississippi.
June 15, 2004.
Rehearing Denied September 14, 2004.
Certiorari Denied December 9, 2004.
*440 Joshua Kevin Brink, appellant, pro se.
Ross Parker Simons, H. Bernard Gautier, attorneys for appellant.
Office of the Attorney General by Jean Smith Vaughan, attorney for appellee.
Before KING, C.J., LEE and CHANDLER, JJ.
CHANDLER, J., for the Court.
¶ 1. After a trial in the Circuit Court of Jackson County, Joshua Kevin Brink was found guilty of capital murder and sentenced to life imprisonment without the possibility of parole. Brink appeals, and raises four assignments of error. Brink argues that the trial court erroneously denied his motion to suppress his videotaped statement, erroneously denied his motion for DNA testing, erroneously denied his motion to exclude gruesome photographs *441 of the deceased, and erroneously denied a proffered jury instruction regarding Brink's character for peacefulness. Finding no error, we affirm.

FACTS
¶ 2. On April 19, 2000, Rachel Bellman's mother dropped Bellman at Rumours, a bar in Ocean Springs. The twenty-five-year-old Bellman did not return home and her mother filed a missing persons report. In the early morning of April 26, 2000, the Ocean Springs Police Department and the Jackson County Sheriff's Department responded to a report of a possible homicide reported by a restaurant manager. The manager reported that the matter was brought to his attention by one of his employees, Warren Frazier. Frazier was acquainted with the eighteen-year-old Brink and with Michael Balle, both of whom lived on Firestone Road. Frazier stated that Brink had mentioned that he and Balle had recently killed a girl and left her body behind an abandoned house at the end of Firestone Road.
¶ 3. The police traveled to Firestone Road, placed Brink and Balle in investigative detention, and continued on to the crime scene at the end of the road. The police searched the abandoned house and discovered blood on the floor along with a woman's black leather jacket. One officer recalled a missing persons report on Bellman, who was last seen wearing a black leather jacket. A search of the property behind the house revealed a woman's body wrapped in a piece of carpet. The body was later identified as that of Rachel Bellman.
¶ 4. During the homicide investigation, Dr. Paul McGarry performed an autopsy of Bellman's body. Dr. McGarry observed that Bellman's mouth, vagina and anus exhibited abrasions indicative of forceful sexual penetration. Bellman had extensive bruising across her face and upper body from blunt trauma. She had nineteen stab wounds across her neck and chest, and cuts on her lips and tongue. Dr. McGarry recovered a two and a half inch shard of glass from Bellman's windpipe that had been forced through Bellman's mouth and down her throat. Bellman's neck was deeply abraded and collapsed inward; Dr. McGarry determined that the cause of death was strangulation.
¶ 5. At the Jackson County Sheriff's Department, Brink executed a waiver of rights form. Then, Brink made a statement to Deputies Brett Tillman and Ken McClenic, which was recorded on videotape. Following are the relevant portions of Brink's statement. On the night of April 19, 2000, Balle met Bellman at Rumours and brought her to the residence on Firestone Road. Balle asked Brink to accompany him and Bellman to the abandoned house. The three walked down Firestone Road to the abandoned house. They went to a bedroom in the rear of the house where they talked and drank beer until Balle asked Brink to talk to him privately. The two went to another room, where Balle stated that he was going to have sex with Bellman and kill her. The two reentered the room with Bellman. Balle told Bellman that she should remove her clothes as part of a cult ritual. Bellman complied, but refused to engage in sexual activity. Balle then stated, "we can do this the hard way or the easy way," and reminded Bellman that they were "out in the middle of nowhere." Bellman then engaged in vaginal sex with Balle. Balle asked Brink to have oral sex with Bellman, which Brink did. Brink then briefly had vaginal sex with Bellman, after which Balle had vaginal and anal sex with Bellman while Brink sat on the floor. When Balle finished, he began hitting and kicking Bellman. *442 He then asked Brink for Brink's belt for the purpose of strangling Bellman. Brink gave Balle the belt, and Balle strangled Bellman with the belt until she stopped moving. Then, Brink and Balle walked back to their residence. After a time, Balle told Brink that they should check on Bellman because she knew their identities. The two returned to the abandoned house and found Bellman alive but barely moving. Balle used a piece of wire to strangle Bellman to death, and Brink pulled a length of carpet from the floor. The two wrapped Bellman's body in the carpet and dumped it behind the house.
¶ 6. Brink was indicted on June 1, 2000, for capital murder with the underlying felony of sexual battery. He was later arrested. At Brink's trial, his videotaped statement was played for the jury. Several of Brink's acquaintances testified that Brink had told them about the killing. Three such acquaintances testified that Brink told them that, after he had sex with Bellman, she threatened to tell the police she had been raped, and Brink struck her head with a beer bottle and stabbed her throat with glass. Based on the evidence presented at trial, the jury found Brink guilty of capital murder. In the sentencing phase, the jurors could not unanimously agree to impose the death penalty, and the court sentenced Brink to life imprisonment without the possibility of parole.

LAW AND ANALYSIS

I. DID THE TRIAL COURT ERRONEOUSLY DENY BRINK'S MOTION TO SUPPRESS HIS STATEMENT?
¶ 7. Prior to trial, Brink moved to suppress his inculpatory statement on the grounds that the statement was given in violation of his right to counsel or that it was not freely and voluntarily given. After a suppression hearing, the trial court found that Brink's right to counsel had not been violated and that his statement had been freely and voluntarily given. Brink argues that the trial court erroneously admitted the statement despite evidence that Brink invoked his Fifth, Sixth and Fourteenth Amendment rights to counsel and that the statement was coerced by threats, violence and promises of reward. Specifically, Brink contends that he gave the statement because one officer slapped and threatened him and other officers promised him lenience in exchange for the statement.
¶ 8. "The applicable standard for determining whether a confession is voluntary is whether, taking into consideration the totality of the circumstances, the statement is the product of the accused's free and rational choice." Porter v. State, 616 So.2d 899, 907-08 (Miss.1993). The trial court must resist any inclination to consider whether the statement is truthful or authentic, and must solely focus on the question of voluntariness. Abram v. State, 606 So.2d 1015, 1031 (Miss.1992). This Court will reverse the trial court's determination of admissibility only if the trial court applied an incorrect legal standard, committed manifest error, or the decision was contrary to the overwhelming weight of the evidence. Balfour v. State, 598 So.2d 731, 742 (Miss.1992). When the trial court makes findings of fact on conflicting evidence, this Court must generally affirm. Gavin v. State, 473 So.2d 952, 955 (Miss.1985).
¶ 9. In Mississippi, trial courts adhere to the following specific procedure to determine whether a criminal confession is voluntary. When a defendant objects to the admission of a confession, the court must hold a hearing outside of the presence of the jury to determine its admissibility. Kelly v. State, 735 So.2d 1071, 1077 (¶ 13) (Miss.Ct.App.1999) (quoting Agee v. *443 State, 185 So.2d 671, 673 (Miss.1966)). The State has the burden of proving beyond a reasonable doubt all facts prerequisite to the admissibility of a confession. Porter, 616 So.2d at 908. The State makes a prima facie case of voluntariness when an officer, or other person with knowledge of the facts, testifies that the confession was made voluntarily without any threats, coercion, or offer of reward. Kelly, 735 So.2d at 1077 (¶ 13). If the State makes a prima facie case that the confession was voluntary, and the accused testifies that violence, threats of violence, or offers of reward induced the confession, a rebuttable presumption is created that the confession was involuntary. Id. at (¶ 14). In light of Miranda, Agee has been interpreted to require the State to offer in rebuttal only those persons who are claimed to have induced the confession through some means of coercion. Abram, 606 So.2d at 1030; Millsap v. State, 767 So.2d 286, 291 (¶¶ 15-16)(Miss.Ct.App.2000) (citing Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). However, during rebuttal, the State is not required to recall witnesses to reiterate their earlier testimony from the State's prima facie case. Id. If the State fails to produce any person claimed to have coerced the confession, the State must provide an adequate reason for the absence of the witness. Id.
¶ 10. At Brink's suppression hearing, the State offered the testimony of several officers and Brink's videotaped statement. Officer William Holloway testified that, on April 26, he assisted in placing Brink in investigative detention. Holloway stated that the authorities transported Brink to the abandoned house, where Brink sat in a patrol car in the road while the authorities investigated. Holloway testified that, in his presence, no one threatened Brink, physically abused him, or made any promises of reward to Brink and Brink never asked for an attorney.
¶ 11. Captain Robert Carew admitted that he slapped Brink during an interview conducted in the road near the abandoned house. Carew testified that he removed Brink from the patrol car, read him his rights, and questioned him. Carew stated that Brink was unresponsive to questioning, and that, to get Brink's attention, Carew lightly slapped him across the cheek with an open hand. He stated that Brink did not fall or slip due to the slap. Carew denied that Brink requested an attorney, that he threatened Brink with a lethal injection, that he otherwise verbally threatened Brink, or that he stated, "are you going to cry now." Carew stated that after the slap, Brink remained unresponsive and he placed Brink back into the patrol car. Carew stated that Sergeant Dean Reiter was present during these events. Carew testified that, other than the slap, neither he nor anyone else coerced Brink, threatened him, or offered him any reward or leniency.
¶ 12. Carew stated that Brink was transported to the sheriff's department where Carew again advised Brink of his rights. Carew stated that Deputy Brett Tillman was present and witnessed Carew reading the rights and Brink's signature on the rights waiver form. Carew testified that, at the department, neither he nor anyone in his presence physically harmed, threatened, coerced, or promised leniency to Brink. Carew stated that Brink appeared mentally normal and not under the influence of alcohol or drugs.
¶ 13. Tillman testified that Carew read Brink his rights, asked Brink if he understood, and asked Brink to initial and sign the rights sheet. He said Brink appeared tired but otherwise normal. He stated that Brink signed the rights waiver form at 3:35 a.m. and at 4:03 a.m. he and Deputy Ken McClenic interviewed Brink.
*444 ¶ 14. Brink's videotaped statement was played in court. On the tape, McClenic questioned Brink about the crime and then asked Brink a series of questions pertaining to voluntariness. Brink stated that he understood his rights and voluntarily had signed the rights waiver form. Brink stated that no one had threatened, harmed, or mistreated him in any way, except that in the woods by the house a detective had slapped him one time. Brink stated that the detective "just slapped [him] once" in order to scare him and get him to tell the truth. He stated that, after the slap, he was frightened and did not want to say anything. Brink said that, now, he was not frightened, was "over it," wanted to get it over with and "hopefully get it done with." He stated that he was not giving the interview because anyone threatened him or because he was scared of any of the officers. Brink said that he understood his rights and that he was giving the interview of his own free will.
¶ 15. Deputy McClenic testified that, during the interview, there were no marks on Brink's face that would have indicated that he had been slapped or beaten. McClenic stated that Brink appeared mentally normal and not under the influence of any intoxicant. He stated that Brink appeared to fully understand what was going on. McClenic stated that no one in his presence threatened Brink, abused him, or promised him anything. McClenic's opinion was that Brink voluntarily gave the statement.
¶ 16. Next, Brink testified. Brink stated that Carew never read him his rights. Brink testified that when he denied all knowledge of the crime, Carew became upset and told him to go for a walk. Brink said that Carew, Brink and Reiter walked toward the abandoned house as Carew and Brink talked; Brink remained unresponsive. Brink said that Carew slapped him and he fell down. Brink said that when he got up, Carew said,"are you going to cry now." Brink stated that Carew said, "boy, you know you're going to die of lethal injection if you don't tell us where the body is at." Brink stated that he said, "I need an attorney," and Carew responded, "well, you're not going to see daylight until you give us a statement," and then put Brink back into the patrol car.
¶ 17. Brink further testified that, at the sheriff's department, he asked to make a phone call and Carew told him that he could not call anyone and made various threatening statements. Brink said that he signed the rights waiver form because he was scared of being hit again. Brink said that before he gave his statement, McClenic and Tillman separately told him that they would help him out and that it would look better at trial and sentencing if he gave a statement. Brink testified that he felt coerced into giving the statement because of the deputies' promises to help him.
¶ 18. The State called Sergeant Dean Reiter in rebuttal. He testified that he was four or five feet away from Carew and Brink at the crime scene. He stated that he thought Carew read Brink his rights at the car, but he was not a hundred percent certain. He stated that Carew and Brink walked sixty or seventy feet from the car down a driveway and he followed. He said that they stopped walking; Carew continued questioning Brink about the crime, and Brink repeatedly denied all knowledge of it. Reiter stated that he heard something that sounded like a slap or hit, but that he could not see because it was dark. He said he heard the sound one time, and then all three of them walked back to the car and the conversation stopped. Reiter said that he did not hear Brink ask for a lawyer after the slap or at any other time. He stated that he did not see Brink get *445 knocked to the ground. Reiter said that he could see Brink's face in the light provided by the patrol car, and that no redness, puffiness, or disfigurement was visible.
¶ 19. Brink's testimony created a rebuttable presumption that his confession was induced by violence, threats and promises. In a detailed opinion, the trial court held that the State had rebutted the presumption of involuntariness with the testimony of the officers and Brink's statements on the videotape. The court held that Brink's confession was voluntary beyond a reasonable doubt, and also that Brink had not invoked his right to counsel.

Voluntariness
¶ 20. Upon reviewing the conduct of the suppression hearing in the court below, we remanded this case for a new suppression hearing. We recognized that, though Brink testified that Deputy Tillman promised him leniency in exchange for a statement, Tillman never testified as to the voluntariness of the confession during the prima facie case or on rebuttal, in violation of the Agee procedure. Abram, 606 So.2d at 1030. Without this testimony or an adequate reason for its absence, this Court was unable to determine whether or not the lower court correctly decided the question of the voluntariness of Brink's statement. Tillman did testify at trial that he never made any threats or promises to Brink. That testimony is irrelevant to the issue of admissibility of the confession because a trial court's determination of voluntariness must be based on evidence heard outside of the presence of the jury. Kelly, 735 So.2d at 1078-79 (¶¶ 19-20).
¶ 21. Therefore, we ordered the lower court to conduct a full suppression hearing and make new findings of fact and conclusions regarding the voluntariness of Brink's videotaped statement. M.R.A.P. 14(b). We reasoned that, had we chosen to reverse for a new trial because of the absence of Tillman's testimony, that reversal would have been based purely upon an Agee violation and not upon an appellate finding that Brink's statement was involuntary. See Powell v. State, 483 So.2d 363, 369-70 (Miss.1986); Foreman v. State, 328 Ark. 583, 945 S.W.2d 926, 931 (1997). On remand for a new trial, the State could have again offered the confession into evidence and again defeated a motion to suppress by proving that the confession was voluntary beyond a reasonable doubt. If the State succeeded, the confession again would have been admitted, making a second trial redundant. Jackson v. Denno, 378 U.S. 368, 394, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) (on remand for a second, procedurally adequate suppression hearing, if the confession is again found voluntary, there is no constitutional requirement for another trial on the issue of guilt or innocence). Accordingly, we remanded this case for the trial court to determine the voluntariness of Brink's statement based upon a new suppression hearing conducted according to the Agee procedure.
¶ 22. On remand, the lower court interpreted our order for a full suppression hearing as allowing it to complete the record of the original suppression by hearing additional testimony. Brink objected to the hearing and argued that he was entitled to a new trial, an argument which we have rejected in the preceding paragraph. At the hearing, the State called Deputy Tillman. Tillman testified that, during his contact with Brink, he did not offer Brink any reward or promise to help Brink in exchange for a statement. After hearing Tillman's testimony, the court made new findings of fact and conclusions. In a detailed opinion, the court held that, considering the totality of the circumstances, Brink's statement had been voluntarily *446 and intelligently given beyond a reasonable doubt.
¶ 23. In making its findings and conclusions, the lower court considered the testimony adduced on remand and the record of the original hearing in which Brink had the opportunity to present evidence and cross-examine witnesses. Brink expressly waived his right to participate in the hearing on remand. We find that the proceedings in the lower court adequately ensured Brink's due process right to a fair and reliable judicial determination of the voluntariness of his confession in accord with Jackson v. Denno. Jackson, 378 U.S. at 376-77, 84 S.Ct. 1774.
¶ 24. We are now able to review Brink's appellate argument that the lower court erroneously found that his confession was voluntary and admissible. In its opinion on remand, the lower court found that Brink's testimony was rebutted by his statements on the videotape that he was "over" the slapping incident, that he was unafraid of the officers to whom he confessed, and that he just wanted it all to be over. The court also found that testimony of the officers rebutted Brink's allegations of coercion. The court found from the totality of the circumstances that the State had put on substantial evidence supporting voluntariness. The court was convinced, despite the State's admission that Carew had slapped Brink, that beyond a reasonable doubt Brink's confession was freely and voluntarily made and was not the result of threats, coercion or promises. The court also addressed the question of whether Brink had invoked his right to counsel. The court found the testimony of the officers more credible and persuasive than Brink's, and found that it was beyond a reasonable doubt that Brink did not invoke his right to counsel at any time during the investigation.
¶ 25. Brink argues that the evidence created a reasonable doubt that the statement was not voluntary and was given in response to promises, threats or inducements. As Brink challenges the lower court's fact-finding, we may reverse only if the trial court committed manifest error or if the decision was against the overwhelming weight of the evidence. Balfour, 598 So.2d at 742. Brink contends that he signed the waiver of rights form because he was frightened of Carew after being slapped and threatened. Brink's confession certainly would have been inadmissible if it was given in response to the slap and threats as Brink alleges. But, there was substantial credible evidence that, while Brink had been slapped by Carew, the incident was not causally connected to his waiver of rights and confession. Brink gave no inculpatory statements until he was away from Carew in the interview room with McClenic and Tillman. Brink stated on the videotape that he was "over" the slapping incident, that he understood the rights he waived, and that he gave the confession of his own free will and not in response to any threats or promises. Further, Brink's testimony that Carew threatened him conflicted with Carew's testimony that he never threatened Brink. The trial court's finding that Brink's confession was not induced by the slap or by threats from Carew was not manifest error or against the overwhelming weight of the evidence.
¶ 26. Brink also avers that his statement was induced by promises of leniency made at separate times by Tillman and McClenic. This contention was refuted by McClenic's testimony during the State's prima facie case that he never made any promises to Brink and that Brink's statement was voluntary, and by Tillman's testimony on remand that he never made any promises to Brink. The *447 trial court did not manifestly err by holding that Brink's statement was not induced by promises of leniency, and the holding was not against the overwhelming weight of the evidence.

Waiver of rights form
¶ 27. Brink also argues that he signed the waiver of rights form because he was afraid of Carew due to the slap and assorted threats. The trial court did not expressly find that Brink voluntarily signed the waiver of rights form. "[V]oluntariness of the waiver of right to counsel is one of the essential components in the overall inquiry regarding admissibility of the confession." Abram, 606 So.2d at 1034. Therefore, it may be inferred from the trial court's finding that the confession was voluntary that the court also found that the defendant voluntarily waived his rights. See id. Carew stated that, other than the slap, he did not threaten Brink at the scene or at the department. Brink said in his videotaped statement that he understood the rights waiver form and voluntarily signed it. The trial court did not commit manifest error or defy the overwhelming weight of the evidence by implicitly finding that Brink voluntarily waived his rights prior to giving the statement.

Right to counsel
¶ 28. We next address Brink's claim that the evidence created a reasonable doubt about whether or not he invoked his Fifth, Sixth and Fourteenth Amendment rights to counsel. Brink's claim that his Sixth Amendment right to counsel was violated is without merit. Under Mississippi law, an accused's Sixth Amendment right to counsel accrues once the accused is in custody and all reasonable security measures of evidence and persons have been completed. Balfour, 598 So.2d at 743. In this context, "custody" has been defined as "a fact generating the legal conclusion that the person is under arrest." Id. Specifically, the right attaches at the point in time when the initial appearance ought to have been held. McGilberry v. State, 741 So.2d 894, 904 (¶ 17) (Miss.1999). The accused must assert the right to an attorney, and, once the right attaches, "any statements obtained from the accused during subsequent police-initiated custodial questioning regarding the charge at issue (even if the accused purports to waive his rights) are inadmissible." Balfour, 598 So.2d at 742 (quoting McNeil v. Wisconsin, 501 U.S. 171, 179, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991)). In the present case, at the time of Brink's confession, Brink was merely a suspect who had been brought to the sheriff's department for questioning. See McGilberry, 741 So.2d at 904 (¶ 18). Therefore, his Sixth Amendment right to counsel had not yet attached.
¶ 29. As Brink's confession occurred during custodial interrogation, Brink had a Fifth and Fourteenth Amendment right to have counsel present. Balfour, 598 So.2d at 744. "The Fifth and Fourteenth Amendment prohibition against self-incrimination requires that custodial interrogation be preceded by advising the defendant that he has the right to remain silent and the right to the presence of an attorney." Id. (quoting Miranda v. Arizona, 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). When an accused invokes the right to counsel, all police questioning must cease "until counsel has been made available, unless the accused initiates further communication with the police." Id."[A] valid waiver of that right cannot be established by proving that the accused responded to further police-initiated interrogation, even if he has been advised or re-advised of his rights." Id. Thus, if Brink invoked his Fifth *448 Amendment right to counsel at the scene by requesting an attorney, the police could not have obtained a valid waiver of that right by having Brink sign a rights waiver form and initiating questioning.
¶ 30. Brink challenges the lower court's finding that he never invoked his right to counsel. Brink's testimony that he invoked the right at the crime scene was contradicted by the testimony of the officers present. The lower court found the testimony of the officers that Brink did not invoke his right to counsel more credible than Brink's assertion that he did so. It is the province of the trial court to assess the credibility of the witnesses and make fact-findings on conflicting evidence. We cannot say that the lower court's finding that Brink never invoked his right to counsel constituted manifest error or was against the overwhelming weight of the evidence.

II. DID THE TRIAL COURT ERRONEOUSLY DENY BRINK'S MOTION FOR FUNDS FOR DNA TESTING?
¶ 31. The State submitted to the Mississippi Crime Laboratory a sexual assault victim evidence collection kit taken from Bellman and sexual assault suspect evidence collection kits from both Brink and Balle. Approximately one month before the trial was scheduled, the State informed Brink that it would not be procuring DNA testing of the three kits for use in its case against Brink. Brink filed an ex parte motion for funds for DNA analysis of the kits and to hire an expert witness to assist in the preparation and presentation of direct evidence regarding the DNA analysis and with cross-examination of any rebuttal experts. Brink's motion urged that the results of DNA analysis of the three kits could provide exculpatory evidence regarding Brink's commission of the felony of sexual battery underlying his capital murder charge. The trial court denied Brink's motion.
¶ 32. "The standard of review of the trial court's denial of expert assistance is that an abuse of discretion occurred such that the defendant was denied due process whereby the trial was fundamentally unfair." Richardson v. State, 767 So.2d 195, 197(¶ 7) (Miss.2000) (citing Coleman v. State, 697 So.2d 777, 780 (Miss.1997)). A defendant may seek state funds for DNA analysis even though the State declines to use the DNA evidence in prosecuting the case. Richardson, 767 So.2d at 198 (¶ 11). The Mississippi Supreme Court has applied the three factors articulated in Ake v. Oklahoma, 470 U.S. 68, 77, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), in determining whether a criminal defendant was entitled to an independent expert to evaluate DNA evidence. Coleman, 697 So.2d at 782.
The first [factor] is the private interest that will be affected by the action of the State. The second is the governmental interest that will be affected if the safeguard is provided. The third is the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided.
Ake, 470 U.S. at 77, 105 S.Ct. 1087. The determination of whether the State must pay for DNA experts or analysis for the defense must be made on a case-by-case basis. Richardson, 767 So.2d at 198 (¶ 12). A defendant cannot secure DNA experts or analysis by making "undeveloped assertions" that the evidence would be helpful, rather, the State is not required to pay for DNA testing unless there is a showing that it would "significantly aid" the defense. Id. at 197, 198 (¶ 7, ¶ 12).
¶ 33. In order to secure Brink's conviction for capital murder, the State had to prove that Brink killed Bellman while engaged in the commission of the crime of *449 sexual battery. Miss.Code Ann. § 97-3-19(2)(e) (Rev.2000). Mississippi Code Annotated section 97-3-95(1)(a) (Rev.2000) provides that "[a] person is guilty of sexual battery if he or she engages in sexual penetration with: [a]nother person without his or her consent." The consent element only requires nonconsensual sexual penetration; force or the victim's reasonable apprehension of force are not necessary elements of sexual battery. Sanders v. State, 586 So.2d 792, 796 (Miss.1991).
¶ 34. In denying Brink's motion for funds, the trial court observed that Brink, on his videotaped statement, clearly admitted to having sexual relations with Bellman. The court found that, because Brink had admitted to sexually penetrating Bellman, Brink had failed to prove that testing the DNA evidence would significantly aid his particular case, and the testing would therefore cause unnecessary expense and delay.
¶ 35. On appeal, Brink argues that the trial court abused its discretion in denying his motion because the DNA evidence could have been exculpatory. He argues that the evidence could have proven whether and how he and Balle penetrated Bellman. Brink's arguments essentially posit two theories of how the evidence could have been exculpatory. Firstly, the evidence could have revealed that no semen from Brink was present in Bellman's vagina or anus. Secondly, the evidence could have revealed that Brink penetrated Bellman vaginally but not anally, which would have supported his trial testimony to that effect as well as the version of events he related in his videotaped statement. Brink also appears to argue that the evidence could have shown whether or not his penetration of Bellman occurred without consent or force.
¶ 36. We find that the trial court did not abuse its discretion in denying Brink's motion for funds. Brink's argument that DNA testing could have shown consent or lack of force is without merit; though there was argument on this point, Brink's counsel admitted in open court that the DNA evidence at issue could only show the fact of penetration of an orifice, and could not show whether or not the penetration was forcible. In his videotaped statement that was admitted into evidence, Brink admitted to having oral and vaginal sex with Bellman. If DNA testing showed that no semen from Brink was present inside Bellman, then that evidence would lend no weight to Brink's version of events, though it would not belie Brink's version because he could have penetrated Bellman without ejaculation. If DNA testing revealed that Brink's semen was present vaginally but not anally, then that evidence would have bolstered Brink's contention that he penetrated Bellman vaginally but not anally, but would not have been conclusive because it could not disprove that Brink penetrated anally without ejaculation. Clearly, for Brink, the sole probative value of DNA analysis of the evidence would have consisted of inconclusive support for Brink's contention that he had vaginal and not anal sex with Bellman. The evidence would not have been at all probative of the issue of consent. We find that the trial court did not abuse its discretion in finding that testing the evidence kits in this case would not significantly aid Brink's defense, and the denial of funds did not deprive Brink of due process of law. See Coleman, 697 So.2d at 782.

III. DID THE TRIAL COURT ERR IN ADMITTING THREE PHOTOGRAPHS OF THE DECEASED?
¶ 37. Brink filed a motion in limine to exclude all post-mortem photographs of Bellman, arguing that the photographs had no probative value and would serve only to *450 inflame the jury. The trial court withheld ruling on the admissibility of the photographs until the State sought to introduce post-mortem photographs of Bellman at trial. Then, the court admitted three photographs offered by the State over Brink's objections. Brink argues that the trial court should have excluded the photographs under Mississippi Rule of Evidence 403 because all three of the photographs were more prejudicial than probative, and two were cumulative of a crime scene videotape that was introduced by the State.
¶ 38. This Court will reverse the trial court's evidentiary ruling admitting photographs for abuse of discretion. Alexander v. State, 610 So.2d 320, 338 (Miss.1992). "Such discretion of the trial judge runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and the extenuation of probative value." McGilberry v. State, 741 So.2d 894, 906 (¶ 27) (Miss.1999). But, gruesome photographs are inadmissible if they have no evidentiary value and serve only to arouse the emotions of the jury. Sharp v. State, 446 So.2d 1008, 1009 (Miss.1984). "[P]hotographs have evidentiary value when they: `(1) aid in describing the circumstances of the killing and the corpus delicti; (2) where they describe the location of the body and cause of death; (3) where they supplement or clarify witness testimony.'" McGilberry, 741 So.2d at 906 (¶ 29) (quoting Westbrook v. State, 658 So.2d 847, 849 (Miss.1995)).
¶ 39. The first photograph, taken during Bellman's autopsy, was introduced during the testimony of Dr. McGarry. The photograph was in color and showed the shard of glass lodged inside Bellman's chest. While the autopsy photograph was certainly gruesome, it had significant probative value because it supplemented and clarified Dr. McGarry's testimony regarding the positioning of the glass inside Bellman's chest. That testimony was relevant to Dr. McGarry's opinion that the location of the glass indicated that it had been forced down Bellman's throat as opposed to having been thrust through her chest. As the photograph aided Dr. McGarry's testimony regarding the circumstances of the killing, the trial court's admission of the photograph was not an abuse of discretion.
¶ 40. Two photographs of Bellman's body were introduced during the testimony of Officer James Sears, who had assisted in the investigation of the crime scene. The photographs showed different views of Bellman's body lying on the carpet after it had been unwrapped. We find that these photographs had evidentiary value and were not solely inflammatory because they assisted Officer Sears in describing the crime scene and the condition and location of Bellman's body.
¶ 41. Brink also argues that the photographs should not have been admitted because they were cumulative of a videotape of the crime scene which also showed the discovery of Bellman's body, but from a farther distance, as well as the interior of the abandoned house. The videotape was admitted during Sears' testimony. In McGilberry v. State, the court found that a crime scene videotape had probative value because it "accurately depicted the location of the [body] and the scene of the crime" and assisted the officers' testimony about the crime scene investigation. McGilberry, 741 So.2d at 907 (¶ 30). The McGilberry court also held that the crime scene videotape was properly admitted although it was somewhat cumulative of crime scene photographs. Id. We find that the probative value of the photographs of Bellman's body and the videotape substantially outweighed any prejudicial effect, and that the photographs and videotape were properly admitted by the trial court.
*451 ¶ 42. Finally, Brink argues that the trial court abused its discretion by failing to conduct an on the record balancing of the probative value and prejudice of the photographs and videotape pursuant to Mississippi Rule of Evidence 403. After each of Brink's objections to the photographs and videotape, the trial court heard the parties' arguments and then admitted the evidence without further comment. Because "Rule 403 is an ultimate filter through which all otherwise admissible evidence must pass," a trial court must consider whether the probative value of questionable evidence is outweighed by undue prejudice. McCullough v. State, 750 So.2d 1212, 1216 (¶ 15) (Miss.1999). While a trial court must certainly balance probative value and prejudice when evaluating evidence under Rule 403, a trial court's failure to articulate the balancing on the record does not require reversal. Hodge v. State, 801 So.2d 762, 772 (¶ 32) (Miss.Ct.App.2001). It is apparent from the record in this case that the trial court balanced the probative value and prejudice of the photographs and crime scene videotape. The court's admission of this evidence was not an abuse of discretion.

IV. DID THE TRIAL COURT ERRONEOUSLY DENY BRINK'S JURY INSTRUCTION REGARDING HIS CHARACTER FOR PEACEFULNESS?
¶ 43. In his pro se supplemental brief, Brink argues that the trial court erroneously denied a proffered jury instruction regarding Brink's character for peacefulness. The instruction stated: "[t]he Court instructs the jury that the Defendant in a criminal case may offer his good character to evidence the improbability of his doing the act charged." Brink argues that the court should have given the instruction because he presented testimony on his peaceful character and the instruction comprised his sole theory of defense.
¶ 44. Brink supplemented this argument in his reply brief. Brink posits that, even if the instruction improperly stated the law, he was entitled to an instruction about his good character and, therefore, the trial court erred by failing to afford Brink time to reword the instruction. Brink cites the case of Harper v. State, 478 So.2d 1017, 1018 (Miss.1985), which requires the trial court, upon presentment of an instruction to which the defense is entitled but which is improperly worded, "either to reform and correct the proffered instruction himself or to advise counsel on the record of the perceived deficiencies therein and to afford counsel a reasonable opportunity to prepare a new, corrected instruction."
¶ 45. Brink argues that the evidence of his peaceful character tended to show that his sex with Bellman was consensual and that he was not guilty of sexual battery, an element of capital murder. Brink is correct that a criminal defendant is entitled to offer his good character as evidence of the improbability that he committed the act charged. M.R.E. 404(a)(1). However, while Brink was entitled to introduce evidence of his good character, he was not entitled to a jury instruction singling out that evidence for the jury to consider in determining his guilt or innocence. Mississippi Code Annotated section 99-17-35 (Rev.2000) prohibits a trial judge from summing up or commenting on the testimony or charging the jury as to the weight of the evidence. "Instructions on general reputation or character of the accused are said to be both argumentative and a comment upon the weight of the testimony." Mattox v. State, 240 Miss. 544, 554, 128 So.2d 368, 370 (1961); see Calloway v. State, 155 Miss. 706, 710-11,125 So. 109, 110 (1929). The trial court properly refused *452 Brink's proffered jury instruction because Brink was not entitled to any jury instruction that emphasized the evidence of his peaceful character. This argument is without merit.
¶ 46. THE JUDGMENT OF THE CIRCUIT COURT OF JACKSON COUNTY OF CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT WITHOUT THE POSSIBILITY OF PAROLE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO JACKSON COUNTY.
KING, C.J., BRIDGES AND SOUTHWICK, P.JJ., LEE, MYERS AND GRIFFIS, JJ., CONCUR. IRVING, J., CONCURS IN RESULT ONLY. THOMAS, J., NOT PARTICIPATING.