# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00046-COA

**TRUITT THOMAS PACE**                                                              **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                              **APPELLEE**

DATE OF JUDGMENT:               12/20/2021
TRIAL JUDGE:                     HON. ROBERT THOMAS BAILEY
COURT FROM WHICH APPEALED:  LAUDERDALE COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:     KATHRINE COLLINS CURREN
ATTORNEY FOR APPELLEE:      OFFICE OF THE ATTORNEY GENERAL
                                  BY: CASEY BONNER FARMER
DISTRICT ATTORNEY:           KASSIE COLEMAN
NATURE OF THE CASE:          CRIMINAL - FELONY
DISPOSITION:                    AFFIRMED - 02/07/2023
MOTION FOR REHEARING FILED:

**BEFORE WESTBROOKS, P.J., McDONALD AND McCARTY, JJ.**

**WESTBROOKS, P.J., FOR THE COURT:**

¶1.    Truitt Pace (Pace) appeals his conviction of first-degree murder and requests a new trial due to (1) the evidence being insufficient; (2) the jury verdict being against the weight of the evidence; (3) the trial court's admitting certain photographs; (4) the State's commenting during closing argument; and (5) the trial court's refusing his self-defense jury instruction. Pace also asserts that these accumulation of the errors resulted in him having a fundamentally unfair trial. Finding no reversible error, however, we affirm Pace's conviction and sentence.

## FACTS

¶2. On June 15, 2018, Pace placed a 911 phone call requesting an ambulance be sent to retrieve his wife, Marsha Pace, at 7016 Brown Hooke Road in Meridian, Mississippi. The 911 dispatcher began to ask Pace standard emergency-protocol questions. Pace first told the dispatcher that the ambulance was necessary because he punched Marsha in the face during an argument. Sometime later, Pace revealed that he had shot Marsha in the head. When the dispatcher asked Pace if the shooting was intentional or accidental, Pace replied, "[A]rgument."

¶3. The 911 call lasted for over an hour, but the exchange between Pace and the 911 dispatcher stopped around the eleven-minute mark. The dispatcher asked Pace to count Marsha's breaths with her to make sure she was still alive. When Pace stopped counting Marsha's breaths, the dispatcher asked Pace to start again. Instead, Pace yelled expletives at the dispatcher, stated that he was busy, and demanded that the ambulance arrive.

¶4. Officer Kara Clark responded to the dispatch call and arrived at the address before the ambulance. Before she arrived, she received information that a woman had been shot in the ear or on the side of the head and that a child was on the scene. She investigated the perimeter of the home before approaching a door inside the carport. Through the glass pane on the door, Clark could see Pace when he approached and asked him, "What happened?" Pace replied that Marsha had "swung" and "pulled on [him]." Clark opened the door. Upon seeing Pace wearing a blood-stained shirt, Clark placed Pace in handcuffs, walked him back to her patrol unit, and placed him on the back seat.

¶5. Clark walked back to enter the home from the carport door. Her body-camera footage

showed Clark walking into the dining room from this entrance. The kitchen was to her left. The home had an open layout with the living room directly ahead of her. The moment she entered the living room, she observed a narrow hallway to the left. On the left side of the hallway, there was an open door to the bedroom where Marsha was lying and could be heard taking grueling and labored breaths. Clark entered this room and examined the scene.

¶6. Marsha was in the bed heaving with her feet against the headboard. Although the lights were off, a television was playing in the background. Using the light emanating from the television screen, Clark saw that Marsha had blood spilling from her nose and mouth. Her hair was matted with blood. Marsha's shirt was also pulled back, her bra was exposed, and blood was covering her chest, abdomen, and legs. The bed Marsha was on had brain matter splattered on the bed frame and on the left side of the bed. Blood splatter was also underneath the bed and on the wall. On the floor, there were puddles of blood, a blood-stained pillow, an unspent bullet, a handgun, and a gun magazine. A broken mirror on the right side of the bed had fallen off the wall, and there was blood on a lampshade that had been flipped over.

¶7. Clark observed Marsha's breathing, and, as a result, knew not to administer CPR. But Clark, seeing the wound "to the back of the head," did not treat the wound because she had not been trained to treat injuries of that magnitude. Clark then backed out of this room and proceeded down the hallway. She saw a bathroom at the end of the hallway and a bedroom to the right of the hallway. She opened the door to the right bedroom and found a child, K.P.,

inside.[1]  K.P., the biological daughter of Pace and K.L. (who was married to W.L.), told Clark that she was home at the time of the shooting.  Clark then told K.P. to stay in the room. The police did not take an official statement from K.P.

¶8.     Another officer, Officer Coleman, arrived and completed a walk-through of the scene, as well.  He began to investigate the scene and take pictures.  He made the same observations as Clark and, in addition, believed that there had been some type of altercation because the room was disheveled.  He also noticed that there was a cell phone by Marsha's head that still had an open 911 line.  Two ambulances arrived on the scene.  The first ambulance arrived and began examining Marsha.  The second ambulance arrived and one of the employees asked about K.P.  The employee was W.L. (K.P.'s stepfather).  He was directed to the bedroom and was allowed to leave with K.P.  Marsha was stabilized and taken to the ER where she later died as a result of the gunshot wound to her head.  Pace was taken into custody and transported to the Lauderdale County jail.

¶9.     Pace was interviewed by Investigator Karey Williams.  Pace admitted to shooting Marsha but stated that it was accidental; his intent was to fire a warning shot to scare Marsha. Based on his statement, he was charged with second-degree murder.  After further investigation of the escalating history of domestic violence between Marsha and Pace, a grand jury returned an indictment for first-degree murder against Pace on August 2, 2019.

## PROCEDURAL HISTORY

¶10.   On August 16, 2019, Pace was arraigned and pled not guilty.  A trial date was set by

---

[1] We use initials as needed to protect the minor's identity.

4

the circuit court. However, because our Supreme Court issued an Emergency Administrative Order, the circuit court recognized the state of emergency created by COVID-19 and continued all cases set for the March 2020 term to May 18, 2020. Additionally, the circuit court continued the circuit court term due to ongoing COVID-19 issues.

¶11. On July 26, 2021, Pace's public defender entered an appearance. Pace's attorney filed a pre-trial motion to suppress certain photographs taken in February 2016 depicting Marsha having injuries, allegedly caused by Pace. Pace argued that the photographs "were inadmissible character evidence, too remote, and unsubstantiated." The circuit court denied the motion, finding that the photographs "intended to show the Defendant's motive, intent, and lack of accident or mistake [and] were significantly more probative than prejudicial."

¶12. Pace was tried for first-degree murder on December 13, 2021. The State's theory was that Pace had shown he was capable of violence through his previous assaults on Marsha and that on the night in question, Pace carried out a plan to kill Marsha.

¶13. The State called Marsha's ex-husband, Steve Harbour, to the stand. Steve testified that he made personal observations of Marsha's "bruises on her face and arms" while she was married to Pace. Specifically, Steve testified that he saw Marsha's bruises on February 7, 2016. The State admitted the February 2016 photographs through Steve's testimony. Steve further testified about other incidents that he did not personally observe. Steve stated one time, Pace ran Marsha and Pace's truck into a ditch. Another time, Steve said, Pace put her out on the side of the road.

¶14. Don P. Bracken, who was Steve's friend, testified that he met with Pace and Marsha

5

in February 2016 in a back alleyway of downtown Meridian. Bracken stated that Marsha told him "she had gotten a black eye a couple of nights before. And she also pulled her left sleeve up and showed me a bruise on her arm where [Pace] grabbed her." Bracken testified that he then called Daniel Steverson.

¶15. Officer Daniel Steverson testified that on February 6, 2016, he was told that a "woman wanted to file a domestic incident that occurred." Steverson testified that Marsha wanted to report an incident but did not want Pace arrested. Steverson also testified that "he did not see any signs of assault." Steverson testified that Marsha told a friend that Pace told her "he was dreaming of finding her dead with a gunshot wound to the head." This statement was not included in Steverson's 2016 report. On cross-examination, Steverson testified that because he did not speak to Pace, he did not obtain Pace's official statement.

¶16. Psychotherapist Jennifer Whitcomb testified that Marsha told her "[Pace] had become physically and emotionally violent. She shared with me some incidents where he had physically beaten her and said that she had stayed for her children." Marsha's last appointment with Dr. Whitcomb was on August 16, 2017. Dr. Whitcomb testified that on that day, she did not see any signs of physical abuse.

¶17. Sherill Clark, who worked with Marsha between August 2017 and December 2017 at a Meridian hospital, testified that she noticed Marsha had bruising on two occasions. Sherill testified that Marsha came to her office one day and showed her a bruise on her chest. According to Sherill, Marsha said that things were "rocky" and that she was "potentially planning to leave." Sherill further testified that Pace made Marsha leave her job in

6

December when Pace got a promotion because he did not want her working outside the home.

¶18. Frances Stephenson, a lawyer who represented Marsha during her divorce from Steve Harbour, testified for the State and said that Marsha came to see her on March 9, 2018, to discuss divorcing Pace. Stephenson stated that Marsha told her there was "some physical violence that was going on in the home." During this consultation, Stephenson testified that she recommended Marsha go to Care Lodge, a facility in Meridian "that helps those people who are in relationships where there is physical violence." Stephenson also testified that Marsha "was scared of [Pace]." Marsha never filed for divorce against Pace.

¶19. Care Lodge advocate Stephanie Stockton also testified for the State. Stephanie stated she discussed "protection orders" and "safety planning" with Marsha about two months before her death. Stephanie stated that Marsha signed release forms for Stephanie to testify on her behalf. Stephanie testified that she noticed bruising on Marsha's arm when she came to see her, and Stephanie further testified Marsha said that "there was physical abuse going on in her home" and that "there was a lot of verbal abuse and that her husband would yell at her a lot and then it would escalate."

¶20. Officer Clark took the stand. Clark testified that while riding in her patrol unit to the precinct, Pace appeared "calm and talkative" and that he was "kind of joking." Clark also testified, during cross-examination, that Pace said that "he felt really sorry, but she pulled the gun. She was swinging at me. I couldn't do anything else." Clark further testified that she did not recall seeing any injuries on Pace. During Clark's testimony, the State submitted her

7

body-camera footage to the jury. Clark testified, after viewing the footage, that Pace had a scratch on his arm. Clark wrote an investigatory report, as well.

¶21. Investigator Karey Williams also testified for the State. Williams had collected the evidence and found (1) the magazine; (2) one unspent .380 round bullet; (3) two live .380 rounds that were not in the magazine; (4) a shell casing underneath the bathroom door; (5) the gun itself; and (6) the cellphone on the bed. Williams testified that he "did not see any injuries" on Pace.

¶22. The State presented expert testimony from Mark Boackle and Dr. Mark LeVaughn. Boackle was recognized as an expert in the field of "firearm and tool mark analysis," while Dr. LeVaughn was recognized as an expert in "forensic pathology." Boackle identified the gun Pace used as a "Walter PK .380 automatic pistol." Boackle determined that the bullet in Marsha's head was shot from the .380 automatic pistol.

¶23. In regard to the gunshot wound, Dr. LeVaughn testified that the bullet struck the back of the left side of Marsha's head "above the ear" and traveled "into the skull and into the brain." Dr. LeVaughn opined that when fired "the gun was not within a foot or [two] of her head" and estimated that the gun was "beyond [two] or [three] feet." Dr. LeVaughn ultimately concluded that Marsha's manner of death was homicide and that her cause of death was a gunshot wound to the head.

¶24. Dr. LeVaughn also testified that Marsha had a scar on her breast region, indicating she had been bruised approximately one year prior. Dr. LeVaughn also testified that Marsha had blunt injuries to her face that were distinct from the gunshot wound. Dr. LeVaughn

8

opined that Marsha had an abrasion (a blood injury) on the right side of her face, meaning something "struck her in the face" in the cheek area. Dr. LeVaughn further opined that Marsha had "two black eyes." In this case, Dr. LeVaughn stated that Marsha's abrasions were not caused by a gunshot wound. Dr. LeVaughn testified that the bleeding in Marsha's eyes were from a recent injury that had not yet healed.

¶25. After the State rested its case-in-chief, Pace did not testify or call any witnesses. Pace rested. After closing arguments, the jury was given its instructions and dismissed for deliberations. The jury returned with a verdict finding Pace guilty of first-degree murder.

¶26. On December 17, 2021, the circuit court sentenced Pace to serve a term of life imprisonment in the custody of the Mississippi Department of Corrections. Pace moved for judgment notwithstanding the verdict or, in the alternative, a new trial, in part, on the grounds that (1) the evidence was insufficient; (2) the verdict was against the weight of the evidence; (3) the circuit court erred by excluding Pace's jury instructions; and (4) the circuit court erred by allowing the State to comment during closing argument, thus, "permitting the State to shift [its] burden of proof onto the Defendant." The circuit court denied Pace's post-trial motion. Pace appeals his conviction and the denial of his post-trial motion.

## DISCUSSION

### I.     Sufficiency and Weight of the Evidence

¶27. On appeal, Pace argues that "the evidence presented by the State is insufficient to support the conviction and goes against the weight of the evidence because the State failed to prove deliberate design." Challenges to the sufficiency of the evidence and challenges to

9

the weight of the evidence are separate issues of error. *Holland v. State*, 290 So. 3d 754, 761 (¶24) (Miss. Ct. App. 2020) ("A challenge to the weight of the evidence, on the other hand, 'is separate and distinct from a challenge to the legal sufficiency of the evidence, in that it seeks a new trial.'"). As such, we examine Pace's issue in two parts.

### A. Sufficiency of the Evidence

¶28. Sufficiency of the evidence claims are reviewed de novo. *Sanford v. State*, 247 So. 3d 1242, 1244 (¶10) (Miss. 2018); *accord Brooks v. State*, 203 So. 3d 1134, 1137 (¶11) (Miss. 2016); *Wayne v. State*, 337 So. 3d 704, 713 (¶32) (Miss. Ct. App. 2022).

¶29. Pace was convicted of first-degree murder in violation of Mississippi Code Annotated section 97-3-19(1)(a) (Rev. 2014), which is defined as, "[t]he killing of a human being without the authority of law by any means or in any manner . . . [w]hen done with deliberate design to effect the death of the person killed, or of any human being, shall be first-degree murder[.]" Therefore, the State carried the burden of proving beyond a reasonable doubt that Pace: (1) killed Marsha; (2) without the authority of law; and (3) with deliberate design to effect her death. In 2018, Pace admitted on the 911 recording that he shot Marsha in the head. The State presented the 911 call to the jury. However, Pace argues that the State failed to prove that Pace intended to kill Marsha.

¶30. "[H]omicide in the case of murder must have been committed with malice and after deliberation." *Hammock v. State*, 379 So. 2d 323, 328 (Miss. 1980). The phrases "deliberate design," "malice," and "malice aforethought" are synonymous under our jurisprudence and "[c]onnote[s] an intent to kill." *Collins v. State*, 221 So. 3d 366, 371 (¶14) (Miss. Ct. App.

2016). "Intent is a question of fact gleaned by the jury." *Id*.

¶31.   "[I]ntent may be prove[d] . . . by showing the acts of the person involved at the time, and the circumstances surrounding the incident." *Id*.   Furthermore, it "may be formed quickly, even moments before the act and may be inferred from the use of a deadly weapon." *Id*. (internal quotation marks omitted); *accord Cooper v. State*, 230 So. 3d 1071, 1080 (¶30) (Miss. Ct. App. 2017); *Holliman v. State*, 178 So. 3d 689, 700 (¶23) (Miss. 2015) ("[D]eliberate design, as a matter of law, may be inferred through the intentional use of any instrument which based on its manner of use, is calculated to produce death or serious bodily injury.").

¶32.   "On review, this Court is required to accept as true the evidence that supports the verdict." *Holland*, 290 So. 3d at 762 (¶28).  Pace pulled a loaded gun on Marsha on the night of her death and shot her above the ear.  The forensic pathologist opined that when Pace shot Marsha, he was approximately two or three feet away.  The jury could have inferred that because of the distance between Pace and Marsha, even if Pace was defending himself prior to shooting Marsha, he was no longer defending himself at the time that he pulled the trigger. These circumstances, combined with witness testimony stating that Pace told Marsha on one occasion that he dreamed of shooting her in the head, witness testimony that Pace on previous occasions domestically abused Marsha, and Pace's statements that on the night in question he punched Marsha in the face, establish that a reasonable jury could have inferred that Pace intended to shoot Marsha in the head with the gun that night.  The jury could have inferred either that Pace planned to do so ahead of time or that he made the decision moments

11

after beating her in the face. Therefore, the evidence was sufficient, and the trial court did not err by denying Pace's motion for judgment notwithstanding the verdict.

### B. Weight of the Evidence

¶33. When considering challenges to the weight of the evidence, "we review the evidence in the light most favorable to the verdict and review the trial court's denial of a motion for a new trial under an abuse-of-discretion standard." *Wayne*, 337 So. 3d at 715 (¶39). "When reviewing a challenge to the weight of the evidence, the Court will disturb a jury verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id*.

¶34. The trial court did not abuse its discretion by denying Pace's motion for a new trial. The evidence here, through eyewitness testimony, established that Pace and Marsha had a tumultuous relationship and that Marsha may have been contemplating divorce for this reason. Although some evidence presented at trial indicated that Pace acted in self-defense, it was for the jury to weigh this evidence and determine its credibility. To support the jury's verdict, the jury could have rejected Pace's 911 statement that they had an argument and his statement to Clark that Marsha pulled a gun on him; instead, the jury could have accepted Dr. LeVaughn's testimony that Marsha was shot from the back of the head from a distance of at least two or three feet. In addition, the jury could have given credibility to the multiple witnesses that testified to Pace not having any visible injuries along with Dr. LeVaughn's testimony that Marsha had blunt injuries to the face distinct from the gunshot wound. Therefore, the trial court did not abuse its discretion in ruling that the jury verdict was not

12

against the overwhelming weight of the evidence.

## II. Admission of the Photographs

¶35. Pace next raises that the trial court erred by admitting the photographs of Marsha allegedly taken in February 2016 through the testimony of Marsha's ex-husband, Steve Harbour, because the photographs prejudiced the jury and had no probative value.

¶36. "Regarding a trial court's decision to admit or exclude evidence, our Supreme Court has stated that 'we review the decision to admit or exclude evidence under an abuse of discretion standard.'" *Moberg v. State*, 303 So. 3d 815, 820 (¶16) (Miss. Ct. App. 2020) (quoting *Bonds v. State*, 138 So. 3d 914, 917 (¶5) (Miss. 2014)).

¶37. Mississippi Rule of Evidence 404(b)(1) states, "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, under Rule 404(b)(2), "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Further, under Mississippi Rule of Evidence Rule 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *Brink v. State*, 888 So. 2d 437, 450 (¶38) (Miss. Ct. App. 2004).

¶38. "The trial judge has almost unlimited discretion in the admission or exclusion of photographs." *Id*. "Photographs have evidentiary value when they: '(1) aid in describing the

circumstances of the killing and the corpus delicti; (2) where they describe the location of the body and the cause of death; (3) whether they supplement or clarify witness testimony.'" *Id.* (quoting *McGilberry v. State*, 741 So. 2d 894, 906 (¶29) (Miss. 1999), *overruled on other grounds by Franklin v. State*, 170 So. 3d 481 (Miss. 2015)).

¶39. The facts surrounding this evidentiary ruling are important because the State argues that under Mississippi Rule of Evidence 404(b)(2), the photos were admissible to show Pace's "motive, intent, and lack of accident or mistake" and to show that a "pattern of domestic violence against the murder victim." *See Carter v. State*, 288 So. 3d 397, 402 (¶20) (Miss. Ct. App. 2019); *Marbra v. State*, 904 So. 2d 1169, 1175 (¶23) (Miss. Ct. App. 2004) (holding that testimony of domestic violence is proper under Rule 404(b)(2)'s permissible uses); *Moss v. State*, 727 So. 2d 720, 725 (¶19) (Miss. Ct. App. 1998).

¶40. However, the photographs in the case here were entered through an ex-husband who did not witness any altercation taking place in February 2016, could not specify on which dates the domestic violence occurred, or who (or what) caused the bruises in the photograph. Steve also did not, himself, take the photographs of Marsha. At bottom, the prosecution did not establish a foundation for the photographs to have been admitted. Therefore, under a proper Rule 403 analysis, the photographs' probative value was substantially outweighed by any one of the listed Rule 403 dangers. Nonetheless, we conclude that the error was harmless and is not reversible. The admission or exclusion of photographs is reviewed under a harmless error standard. *Stringer v. State*, 500 So. 2d 928, 934 (Miss. 1986). In *Stringer*, the Supreme Court stated that the error was not harmless because the jury was inflamed by

14

the presentation of the photographs during closing arguments. *Id*. at 935. "Even errors involving a violation of an accused's constitutional rights may be deemed harmless beyond a reasonable doubt where the weight of the evidence against the accused is overwhelming." *Ambrose v. State*, 254 So. 3d 77, 105 (¶69) (Miss. 2018). Because the evidence against Pace was so overwhelming, as previously discussed, we decline to conclude that the trial court's error warrants reversal.

### III. Improper Closing-Argument Comment

¶41. Pace argues that the trial court erred by sustaining the State's objection to Pace's comment on the State's failure to call his child, K.P., to the stand during Pace's closing argument. Pace also claims that it was then improper for the State to comment on his failure to call K.P. as a witness during the State's closing argument.

### A. Pace's Counsel's Comment During Closing Argument

¶42. During Pace's closing argument, Pace's counsel stated that K.P. "was there the entire night that this event occurred. We did not hear from her." The State objected and stated that Pace's counsel's comment was improper. Pace's counsel stated that she was highlighting which witnesses the State had an opportunity to call but failed to do so. The trial court sustained the objection and struck the comment.

¶43. We find that the circuit court did not abuse its discretion by sustaining the State's objection. "[T]he failure of either party to examine a witness equally accessible to both parties is not a proper subject for comment before a jury." *Ross v. State*, 603 So. 2d 857, 864 (Miss. 1992). Furthermore, "when the record provides no proof of the absent witness's

15

accessibility or inaccessibility, this Court nonetheless presumes that both parties had equal access to the witness." *Id*. (citing *Madlock v. State*, 440 So. 2d 315, 318 (Miss. 1983)).

¶44.    The record before us does not indicate that the State had any more access to K.P. than Pace.  Therefore, the presumption is that K.P. was equally available to both Pace and the State.  K.P. is Pace's biological daughter.  Although Pace's appellate counsel stated during oral argument that Pace's ex-wife, K.L., retained custody of K.P., nothing in the record indicates that Pace attempted to subpoena K.P. or otherwise ask for the court's assistance in gaining access to her.  Accordingly, we conclude that Pace has failed to show that K.P. was inaccessible to him.  Therefore, it was not an abuse of discretion for the trial court to sustain the State's objection.

### B.    The State's Comment During Closing Argument

¶45.    After Pace's counsel made his closing argument, the State returned to give its rebuttal. The State, responding to Pace's counsel's prior comment, stated

> It is not optimal to have a kid in the house when you shoot your wife.  Which by the way, they had every right to bring that child in here if they wanted to further traumatize her.  They have the same subpoena power we have.  [We] made the decision not to call [K.P.].  I hope it wasn't the wrong one.

¶46.    Notably, Pace did not object to the State's comments.  "In order to preserve an issue for appeal, counsel must object.  The failure to object acts as a waiver." *Gales v. State*, 299 So. 3d 861, 868 (¶20) (Miss. Ct. App. 2020) (quoting *Jackson v. State*, 174 So. 3d 232, 236 (¶11) (Miss. 2015)).  Consequently, Pace is procedurally barred from raising this issue.

### IV.    Refusal of Jury Instruction

¶47.    Pace next argues that the trial court denied Pace his theory of defense by refusing his

self-defense jury instruction marked "D-8." Pace stated that the D-8 instruction followed the "Mississippi Supreme Court Model Instructions" and "tracked the model instruction 509 for self-defense." The D-8 instruction stated:

JURY INSTRUCTION REFUSED D-8

In order for the defendant to have acted in self-defense, the Truitt Thomas Paced [sic] must have (l) believed that he was in actual danger; (2) have reasonably believed that Marsha Pace intended to kill the him; or (3) have reasonably believed that Marsha Pace intended to cause great bodily harm to the him, and that Truitt Thomas Pace reasonably believed that Marsha Pace was about to carry out her actions against him. Truitt Thomas Pace does not have to prove that he acted in self-defense. The State has the burden of proving beyond a reasonable doubt that Truitt Thomas Pace did not act in self-defense. If you find that the State did not prove beyond a reasonable doubt that Truitt Thomas Pace did not act in self-defense, then you shall find Truitt Thomas Pace not guilty of first degree murder.

The State argued, without presenting authority, that many of the model jury instructions decided on in 2012 had been overruled or changed. The trial court concluded that its C-8 instruction was sufficient, and refused Pace's D-8 instruction. The trial court's instructions stated:

JURY INSTRUCTION GIVEN C-8

The Court instructs the jury to make a killing justifiable on the grounds of self-defense, the danger to the defendant must be either actual, present and urgent, or the defendent [sic] must have reasonable grounds to apprehend a design on the part of the victim to kill him or to do him some great bodily harm, and in addition to this he must have reasonable grounds to apprehend that there is imminent danger of such design being accomplished. It is for the jury to determine the reasonableness of the ground upon which the defendant acts. If the jury finds that the defendant acted in necessary self-defense, then you shall return a verdict of not guilty.

JURY INSTRUCTION GIVEN C-4

17

The law presumes every person charged with the commission of a crime to be innocent. This presumption places upon the state the burden of proving the defendant guilty of every material element of the crime with which he is charged. Before you can return a verdict of guilty, the state must prove to your satisfaction beyond a reasonable doubt that the defendant is guilty. The presumption of innocence attends the defendant throughout the trial and prevails at its close unless overcome by evidence which satisfies the jury of his guilt beyond a reasonable doubt. The defendant is not required to prove his innocence.

¶48. We review challenges to the trial court's refusal of a jury instruction for abuse of discretion. *McNeer v. State*, 307 So. 3d 508, 513 (¶12) (Miss. Ct. App. 2020) ("When jury instructions are challenged on appeal, we are mindful that trial courts are given considerable discretion regarding the instructions form and substance. It is well settled that the standard of review for the giving or refusing of jury instructions is an abuse of discretion.").

¶49. "[A] defendant is entitled to have every legal defense he asserts be submitted as a factual issue for determination by the jury under proper instruction of the court. In essence, the jurisprudence of this State demands that a theory of defense must be adequately instructed if the evidence warrants." *Id.* at 514 (¶14) (citing *Giles v. State*, 650 So. 2d 846, 849 (Miss. 1995)). But this right "is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Hearn v. State*, 3 So. 3d 722, 738 (¶45) (Miss. 2008). Meaning, the reviewing court must read the jury instructions "as a whole, and if all instructions fairly, but not necessarily perfectly, announce the applicable rules of law, no error results." *Cooper v. State*, 230 So. 3d 1071, 1077 (¶19) (Miss. Ct. App. 2017).

¶50. We review the jury instructions as a whole, and we find that the trial court covered

Pace's jury instruction elsewhere in the instructions. *Hearn*, 3 So. 3d at 738 (¶45); *Cooper*, 230 So. 3d at 1077 (¶19). Therefore, the trial court did not abuse its discretion. Pace's issue is without merit.

### V.     Cumulative Error

¶51.    As a final argument, Pace contends that the many errors in his trial necessitate reversal. "The cumulative error doctrine stems from the doctrine of harmless error, codified under Mississippi Rule of Civil Procedure 61." *Ross v. State*, 954 So. 2d 968, 1018 (¶138) (Miss. 2007). The cumulative error doctrine "holds that individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." *Lacey v. State*, 310 So. 3d 1206, 1216 (¶27) (Miss. Ct. App. 2020).

¶52.    "As when considering whether individual errors are harmless or prejudicial, relevant factors to consider in evaluating a claim of cumulative error include whether the issue of innocence or guilt is close, the quantity and character of the error, and the gravity of the crime charged." *Ross*, 954 So. 2d at 1018 (¶138). "That is, where there is not overwhelming evidence against a defendant, we are more inclined to view cumulative errors as prejudicial." *Id*. Here, the evidence presented a singular error regarding the trial court's admission of photographs, but we held that error to be harmless. This issue is without merit.

### CONCLUSION

¶53.    We conclude that Pace was provided a fundamentally fair trial. Therefore, we affirm Pace's conviction of first-degree murder and sentence and the trial court's denial of Pace's

post-trial motion for a new trial.

¶54.    **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., McDONALD, LAWRENCE, McCARTY AND EMFINGER, JJ., CONCUR. WILSON, P.J., AND GREENLEE, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. SMITH, J., NOT PARTICIPATING.**